UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 11-24142-CIV-SEITZ/SIMONTON

FIVE FOR ENTERTAINMENT S.A., *et al.*,

          Plaintiffs,

vs.

RAMON LUIS AYALA RODRIGUEZ, *et al.*,

          Defendants.
_____/

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS

This matter is before the Court on Defendants' Motion to Dismiss Amended Complaint [DE-48]. This case arises from a failed series of concerts in Argentina involving Daddy Yankee, a multiple Grammy award-winning singer of Reggaeton music. Plaintiffs entered into two contracts to promote and produce ten Daddy Yankee concerts scheduled for November of 2010. After Plaintiffs expended more than $1,000,000 in support of the tour, and just days before the first concert, Defendants issued a press release canceling the entire tour. The press release, which Defendants posted on their own websites, indicated that Plaintiffs had failed to pay monies owed to Daddy Yankee and blamed Plaintiffs for the canceled tour. Plaintiffs' First Amended Complaint alleges claims for breach of contract, defamation, and various other claims. Defendants assert that Argentine law applies to Plaintiffs' defamation, injurious falsehood, Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), and civil conspiracy claims and, therefore, those claims should be dismissed. Defendants also seek to dismiss the breach of contract claim against Daddy Yankee and El Cartel Records because they did not sign the contract. Because there is a false conflict of laws as to the defamation, injurious falsehood, and civil conspiracy claims, the motion is denied as to those claims. Because Defendants have failed

to establish Argentine law as to the FDUTPA claim, the motion is denied as to that claim. The motion is also denied as to the breach of contract claim because the contract was executed by agents of Daddy Yankee and El Cartel Records.

## I. Background Facts

The facts, taken from the Amended Complaint, are as follows: Plaintiffs, Five for Entertainment S.A., d/b/a/ Five Live Entertainment ("Five Live") and its president and majority shareholder, Diego Hernán De Iraola ("De Iraola"), are in the business of producing and promoting concerts for musical artists in Argentina. On June 8, 2010, Five Live and Defendant El Cartel Records, Inc. ("El Cartel") entered into an "Artist Engagement Contract" for a series of six performances by Defendant Ramón Luis Ayala Rodriguez a/k/a Daddy Yankee in Argentina. The Artist Engagement Contract states that it is governed by the laws of the State of New York. Under the terms of that contract, Five Live agreed to pay a total of $820,000 to Defendant Icaro Services, Inc. ("Icaro"), Daddy Yankee's booking agent, payable in four $205,000 payments. Although the contract specified dates for those payments, Plaintiffs allege that all parties understood the payments would actually be made on a rolling basis. Between June and November 2010, De Iraola made thirteen payments to Icaro's president Edgar Baldiri Martinez ("Baldiri") totaling $796,895.

Per the terms of the contract, Five Live paid all costs associated with the concerts, including the cost of equipment, lighting, audio and technical support. Five Live also arranged for and paid all transportation, food and lodging for Daddy Yankee and thirty members of his staff. Five Live also made down payments in excess of $150,000 for airfare and lodging in anticipation of the concerts.

Daddy Yankee arrived in Argentina in September 2010 for a promotional tour in advance of the concerts. During this promotional tour, and allegedly at the behest of Baldiri, Daddy Yankee made public statements announcing four additional concerts, describing the tour as ten shows, not six as specified in the contract. After the producers of the additional shows backed out, Baldiri advised De Iraola that the Defendants expected Five Live to produce the additional four shows. Further, Baldiri threatened to cancel the six-show tour unless De Iraola agreed to produce the entire ten-show tour.[1] De Iraola agreed to the demands and immediately took steps to promote the additional shows. De Iraola traveled extensively to different venues, negotiated contracts with local vendors and producers, and commenced integration of the existing marketing and logistic efforts already underway with those necessary for the additional shows.

De Iraola performed all of this work without a contract for the additional shows and without an agreement for the amount or timing of Daddy Yankee's fee for the additional four shows. On October 24, 2010, De Iraola traveled to Columbia to meet with Baldiri and discuss payment for the four additional shows, but they were unable to reach an agreement. On October 27, 2010, Argentina's former President Nestor Kirchner, spouse of the then President, Cristina F. de Kirchner, passed away unexpectedly. As a result, weekend games for the national soccer team were suspended, requiring the games to be rescheduled at venues and on dates scheduled for Daddy Yankee's tour. The parties thereafter rescheduled the tour, with the first concert set to start on November 19, 2010.

On November 1, 2010, Baldiri, who was in Florida at the time, emailed De Iraola a draft

---

[1] According to the Amended Complaint, Baldiri made many of these threats while working out of Icaro's offices in Florida. *See* Am. Compl., ¶¶ 44, 54.

contract for the additional shows. Under its terms, De Iraola would pay Daddy Yankee $480,000 for the additional shows. The contract price was payable in four installments on specified dates set forth in the contract, three of which had already passed by the time Baldiri emailed the contract to De Iraola. De Iraola immediately signed and emailed the contract back to Baldiri. No Defendant, however, signed the agreement. On November 10, 2010, the parties agreed that the fee would be paid upon Daddy Yankee's arrival in Argentina.

Without specifying the time frame involved, Plaintiffs allege that Baldiri demanded payment in full of the $480,000. De Iraola offered to wire the money to Icaro's account once Daddy Yankee and his staff arrived in Argentina. De Iraola maintains it was necessary to condition payment on Daddy Yankee's arrival in Argentina because of Baldiri's repeated threats to cancel the tour. On November 16, 2010, Mireddys Gonzalez, Daddy Yankee's manager, sent an email to De Iraola indicating that she would cancel the tour if De Iraola failed to promptly pay the entire fee for all ten shows. De Iraola offered to begin the wire transfer before Daddy Yankee left the United States if an Icaro employee traveled to Buenos Aires to supervise the transfer of funds. Gonzalez and Baldiri refused that offer. Plaintiffs allege that Baldiri was in Florida at this time.

On November 17, 2010, two days before the first concert was to take place, Icaro issued an official communication from its Miami office to the media announcing the cancellation of all ten of Daddy Yankee's shows. According to the Amended Complaint, in the past Daddy Yankee and his staff had cancelled shows in a similar manner, including shows in Peru, Guatemala, and Chicago. On that same date, Daddy Yankee posted a press release on his personal website and Icaro's website, both of which are available to the public. Plaintiffs allege that the press release

contains the following false statements:

> (I) Plaintiff De Iraola, producer and party responsible for the concerts in Argentina, was in arrears and owed more than 40% of Daddy Yankee's fee for the shows; (ii) Defendants had afforded Plaintiff De Iraola every opportunity to pay and offered him different alternative means of complying with his contractual obligations; (iii) Defendants' goodwill and efforts had been in vain because on the day prior to the scheduled trip to Argentina, Plaintiffs were still in default, and (iv) Plaintiff Five Live, under the direction of Plaintiff De Iraola, had failed to adequately perform its contractual obligations under the governing contract.

Compl., ¶71. In their responses to Plaintiffs' discovery requests, Defendants admitted that the press release was made with the knowledge, consent, and approval of Baldiri, Icaro, El Cartel, and Daddy Yankee. The contents of the press release were thereafter picked up by more than 130 media outlets, including internet, television, and radio.

In the weeks following the press release, Baldiri continued to make false statements against Plaintiffs, such as in a phone conversation with an Argentine publication on November 23, 2012. One article from the Argentine press indicates that Baldiri had called from Miami to say that De Iraola had swindled Daddy Yankee, his staff, and local producers in Argentina by signing forged agreements and pocketing amounts that were meant to go to the sale of shows and advertising promotions. Some of these local producers traveled to Miami and met there with Baldiri, where Baldiri made the allegedly defamatory statements. Another article indicates that Baldiri also stated that De Iraola entered into agreements on behalf of Five Live even though De Iraola was not affiliated with Five Live. In another article, it was reported that Five Live had failed to confirm flight arrangements and work visas for Daddy Yankee's entourage. Plaintiffs allege that Baldiri repeated these allegations in at least ten additional publications. As a result of the cancellation of the shows and the "smear" campaign perpetrated by the Defendants, Plaintiffs

allege they are no longer a viable business and De Iraola has suffered debilitating anxiety and numerous physical maladies. He has been admitted to the emergency room several times and remains under the care of a psychiatrist.

Plaintiffs' Amended Complaint consists of eight counts, including contract claims, equitable claims, tort claims, and statutory claims, all arising from the failed concert series and subsequent public statements made by Defendants. The two contract claims Five Live asserts against Daddy Yankee and El Cartel are Count I (Breach of Contract - Engagement Contract) and Count II (Breach of Contract - Second Contract). The two equitable claims are pled in the alternative to the contractual claims and also involve Five Live against Daddy Yankee and El Cartel, namely Count III (Unjust Enrichment) and Count IV (Quantum Meruit). The two tort claims are Count V (Defamation [Plaintiffs Five Live and De Iraola against Defendants Daddy Yankee, El Cartel, Icaro and Baldiri]) and Count VI (Injurious Falsehood [Plaintiffs Five Live and De Iraola against Defendants Daddy Yankee, El Cartel, Icaro and Baldiri]). Count VII is filed on behalf of both Plaintiffs against all Defendants and asserts a violation of FDUTPA. Finally, Count VIII alleges a civil conspiracy to defame against all Defendants. Defendants seek dismissal of Counts I, II, and V-VIII for failure to state a claim.

## II.     Legal Standard

The purpose of a motion to dismiss filed pursuant to Rule 12(b)(6) is to test the facial sufficiency of a complaint. Although a complaint challenged by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff is still obligated to provide the "grounds" for his entitlement to relief, and a "formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Once a court

"identifies pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," it must determine whether the well-pled facts "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). A complaint can only survive a 12(b)(6) motion to dismiss if it contains factual allegations that are "enough to raise a right to relief above the speculative level, on the assumption that all the [factual] allegations in the complaint are true." *Twombly*, 550 U.S. at 555. However, a well-pled complaint survives a motion to dismiss "even if it strikes a savvy judge that actual proof of these facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556.

### III. Legal Analysis

#### A. Choice of Law: Defamation, Injurious Falsehood, and Civil Conspiracy (Counts V, VI, and VIII)

Defendants first contend that the defamation, injurious falsehood, and civil conspiracy claims fail to state a cause of action because, under Florida's choice of law principles, the law of Argentina applies to these claims, and Plaintiffs' claims do not exist under Argentine law. Plaintiffs, on the other hand, urge the Court to apply Florida law because: (1) the Defendants fail to offer a sufficient basis to apply the law of Argentina over Florida law; (2) there is no conflict of law issue; and (3) even assuming that there is a valid conflicts of law issue, Florida has the most significant contacts with this case, such that Florida law should apply. In reply, Defendants point to Plaintiffs' expert declaration to say it establishes that a true conflict exists because under Argentine law Plaintiffs' claims would produce different results and that Plaintiffs impermissibly "bundle" claims that must be analyzed separately as a matter of law.

7

### *i. The Record Permits the Court to Address the Choice of Law Issue*

Plaintiffs first argue that Defendants have failed to establish Argentine law as to defamation, injurious falsehood, and civil conspiracy. The Eleventh Circuit has stated that a district court is not required to conduct its own research into the content of foreign law. *Mutual Service Insurance, Co. v. Frit Industries, Inc.*, 358 F.3d 1312, 1321 (11th Cir. 2004). Thus, where "either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law except when to do so would not meet the needs of the case or would not be in the interests of justice." *Id.* (quoting Restatement (Second) of Conflict of Laws, § 136, cmt. h, at 378-79 (1971)). Plaintiffs assert that Defendants have failed to provide sufficient information about Argentine law because the declaration Defendants submitted simply translates several selected sections of the Argentine Civil Code, without any context, analysis, conclusions, or even an explanation as to why those Code sections were chosen. While the Court agrees that Defendants initially failed to provide the information the Court needed to make a choice of law determination, because Plaintiffs did so in their response, through the Declaration of Marcelo Martin, III, Defendants were able to make their arguments in their reply. Consequently, the Court will address the choice of law issue.

### *ii. Choice of Law: Defendants Have Raised False Conflicts*

Plaintiffs next argue that the Court need not do a choice of law analysis because this case involves false conflicts. A court need only undertake a conflict of law analysis if a true conflict exists. *Tune v. Philip Morris, Inc.*, 766 So. 2d 350, 352 (Fla. 2d DCA 2000). A false conflict exists when "the laws of different states are (1) the same, (2) different but would produce the

same outcome under the facts of the case, or (3) when the policies of one state would be furthered by the application of its laws while the policy of the other state would not be advanced by the application of its laws." *Id.*   Plaintiffs argue that the false conflicts here are of the first and second type.   The Court will address each count separately.

### *a. There is No Conflict as to Defamation (Count V)*

Plaintiffs maintain that the elements of defamation under Florida law and Argentine law are the same and, thus, there is a false conflict. Under Florida law, the elements of a claim for defamation are: (1) publication; (2) falsity; (3) the actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory. *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008).   Plaintiffs have submitted the Declaration of Marcelo Martin, III (Martin Declaration), a member of the Bar of the Federal Capital [Argentina], which sets out the elements of a claim for defamation under the Argentine Civil Code. *See* Martin Declaration, DE-66-1 at ¶15.   Those elements are: (1) the publication (oral or written), (2) of false information or statements concerning the plaintiff, (3) knowingly and with the intent to cause harm to the person or rights of the aggrieved party, or simply by negligence, and (4) damage that is quantifiable in money to the person, property and/or rights of the aggrieved party. Where the defamatory statement concerns the imputation of criminal conduct it is known as "calumnias" and where the defamatory statement generally dishonors or discredits the person it is known as "injurias." *See* Martin Declaration at n.8.   A comparison of the elements under Florida and Argentine law leads to the conclusion that the laws are the same.   Both require publication, falsity, that the statements were made knowingly or at

9

least negligently, that the plaintiff suffer damages, and that the statement is defamatory or dishonors or discredits the person.

Defendants maintain that the laws are not the same because the damages recoverable under Florida and Argentine law are not the same. However, Defendants have provided no authority to support this argument. Furthermore, even if Argentine law were to apply, Plaintiffs have adequately pled a claim under Argentine law because Plaintiffs have pled all of the elements of defamation under Argentine law: (1) publication; (2) of false statements that Plaintiffs were solely responsible for the last minute cancellation of the Daddy Yankee tour; (3) that Defendants knew or should have known that the statements were false because Defendants had no reasonable factual basis to make the statements; and (4) that Plaintiffs suffered monetary damages.[2] Consequently, the motion to dismiss Plaintiffs' defamation claim, Count V, is denied.

### b. There is No Conflict as to Injurious Falsehood (Count VI)

Plaintiffs argue that there is also a false conflict as to their claim for injurious falsehood because the result is the same under either Argentine or Florida law. Under Florida law, the elements of the tort of injurious falsehood are: (1) a falsehood; (2) published or communicated to a third party; (3) the defendant knew that the falsehood would likely induce others not to deal with the plaintiff; (4) the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff; and (5) special damages. *Bothmann v. Harrington*, 458 So. 2d 1163, 1168 (Fla. 3d DCA 1984). The "gist of the tort of injurious falsehood is the intentional

---

[2] Even if the Court had concluded, as Defendants urge, that choice of law rules require the application of Argentine law, Defendants have not pointed out how Plaintiffs failed to adequately plead a claim for defamation under Argentine law. Thus, the Court finds that this argument was not well taken.

interference with another's economic relations." *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 386 (Fla. 4th DCA 1999). While Plaintiffs admit that Argentina does not have a cause of action called "injurious falsehood," Plaintiffs argue that such a claim falls under a claim for defamation under the Argentine Civil Code because defamation under Argentine law permits recovery for harm to property rights. According to the Martin Declaration, under the Argentine Civil Code, any defamatory conduct that affects business operations is actionable under the claim of defamation. *See* DE-66-1 at ¶¶36-38. Thus, Plaintiffs maintain that a claim for injurious falsehood under Florida law and a claim for defamation causing harm to business operations under Argentine law are the same and lead to the same result.

Defendants, on the other hand, argue that Argentine law does not recognize a claim for injurious falsehood and, therefore, there is a true conflict. However, as Defendants concede, defamatory conduct that affects the business operations of a physical or legal person is actionable under the Argentine claim of defamation. Thus, Defendants concede that the basis of Plaintiffs' injurious falsehood claim can also be the basis for a claim under the Argentine Civil Code. Defendants have not provided any authority that requires that different jurisdictions use the same name for a cause of action in order for it to be the same cause of action and for there to be no conflict. As Shakespeare said "What's in a name? that which we call a rose/By any other name would smell as sweet." *Romeo and Juliet*, Act II, Scene II.

While the elements of a Florida injurious falsehood claim and an Argentine defamation claim do not align exactly, they are essentially the same: both require a publication of a false statement, knowingly with the intent to cause harm to the person's business interests, and

11

damages to the business interests. Furthermore, based on the facts alleged by Plaintiffs, the results would be the same under either claim. Consequently, there is a false conflict and the Court need not determine which law to apply.

### c. There is No Conflict as to Civil Conspiracy (Count VIII)

Finally, Plaintiffs assert that there is a false conflict as to their claim for civil conspiracy. Plaintiffs maintain that, while the Argentine Civil Code does not expressly recognize civil conspiracy as a separate cause of action, it does permit recovery under defamation when three or more persons engage in defamatory conduct. Under Florida law, in order to plead a claim for civil conspiracy, a plaintiff must plead (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Russo v. Fink*, 87 So. 2d 815, 819 (Fla. 4th DCA 2012). Each conspirator is jointly and severally liable for each act done in pursuance of a conspiracy. *Nicholson v. Kellin*, 481 So. 2d 931, 935 (Fla. 5th DCA 1985). Under the Argentine Civil Code, the obligation to compensate harm caused by a crime, such as defamation, rests jointly and severally on all those who participated in the crime as authors, advisors, or accomplices. *See* Martin Declaration at ¶33. Based on Florida and Argentine law, Plaintiffs again argue that regardless of what the claim is called, the facts will lead to the same outcome under either law.

In response, Defendants repeat the same argument for dismissal that they made regarding injurious falsehood – that the Argentine Civil Code does not recognize such a claim because it does not expressly codify a separate cause of action for civil conspiracy. However, an application of either law to the facts alleged in Plaintiffs' civil conspiracy claim would lead to the

same outcome under either a Florida civil conspiracy claim or a claim against the Defendants for defamation as the authors, advisors, or accomplices to the defamation alleged. Consequently, this is another false conflict and, therefore, the motion to dismiss the civil conspiracy claim must be denied.

### B. Choice of Law: FDUTPA (Count VII)

Defendants also seek to dismiss Plaintiffs' FDUTPA claim because Argentine law also applies to that claim and Argentina does not have an analogous law. However, as stated above, a district court is not required to conduct its own research into the content of foreign law. *Mutual Service Insurance, Co. v. Frit Industries, Inc.*, 358 F.3d 1312, 1321 (11th Cir. 2004). Thus, where "either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law except when to do so would not meet the needs of the case or would not be in the interests of justice." *Id.* (quoting Restatement (Second) of Conflict of Laws, § 136, cmt. h, at 378-79 (1971)).

Defendants have failed to provide sufficient information to determine Argentine law regarding claims that would be analogous to a FDUTPA claim. The Defendants have not submitted any evidence as to the law in Argentina regarding such a claim. Their Declaration of Diego Brian Gosis [DE-48-1] is insufficient to establish Argentine law as to such a claim. The Gosis Declaration simply translates a section of the Argentine Civil Code called the "Consumer Protection Act." There is no explanation as to whether this is the only potentially applicable Code section nor does Gosis state that there is no section of the Argentine Civil Code that would create a cause of action based on the facts alleged. Further, an unsworn statement in the motion papers that "defendants have not found Argentine codes establishing a claim similar to FDUTPA

13

for the plaintiffs to allege" is insufficient to establish the non-existence of such a claim under Argentine law. Plaintiffs also have not submitted any information regarding any Argentine law similar to FDUTPA. The Martin Declaration does not discuss FDUTPA. Therefore, Defendants cannot rely on it to support their motion, as they did regarding the defamation, injurious falsehood, and civil conspiracy claims. Defendants reply argues that, because the Martin Declaration does not address FDUTPA, the Court should treat that silence as an admission that such a claim does not exist under Argentine law. However, the burden is on Defendants, as the moving party, to establish Argentine law and to establish the existence of a conflict. Defendants have not done this. Consequently, the motion to dismiss Plaintiffs' FDUTPA claim is denied.

### C. Breach of Contract (Count I)

Last, Defendants seek to dismiss Count I, the breach of contract claim against Defendants Daddy Yankee and El Cartel for breach of the Artist Engagement Contract, because Daddy Yankee and El Cartel are not signatories to the contract. Plaintiffs respond that the Amended Complaint alleges that the signatories of the Artist Engagement Contract were the agents of Daddy Yankee and El Cartel and thus Daddy Yankee and El Cartel are the true parties to the contract. While Defendants concede that Plaintiffs have adequately pled the existence of an agency relationship, Defendants argue that the contract terms indicate that it is between Icaro and Plaintiffs. However, a reading of the Artist Engagement Contract indicates otherwise.

The Artist Engagement Contract states that it is between Five Live Entertainment, represented by De Iraola, and Icaro, represented by Baldiri, on behalf of El Cartel Records, Inc., represented by Gonzalez. *See* DE-35-1 at 47. The contract further states that El Cartel Records "is the manager for the artist known as Daddy Yankee and that it has sufficient power and legal authority to enter into this contract *on behalf of* said artist." *Id.* (emphasis added). Thus, the

contract states that Baldiri entered into the contract on behalf of El Cartel and, through El Cartel, on behalf of Daddy Yankee. Consequently, according to the terms of the contract, Baldiri was the agent for El Cartel and Daddy Yankee.

Under New York law, which governs the Artist Engagement Contract, a principal is liable on a contract entered into on its behalf by an authorized agent. *Plymouth Rock Fuel Corp. v. Leucadia, Inc.* 474 N.Y.S.2d 79, 81 (N.Y. App. Div. 1984). Thus, for purposes of a motion to dismiss, Plaintiffs need only allege that Badiri was the authorized agent of El Cartel and Daddy Yankee when Baldiri entered into the Artist Engagement Contract. The Amended Complaint has done this. Furthermore, attached as exhibits to the Amended Complaint are responses to requests for admissions in which Baldiri, Icaro, El Cartel, and Daddy Yankee admit that Daddy Yankee authorized Icaro and El Cartel to enter into the Artist Engagement Contract on his behalf. Consequently, Plaintiffs have sufficiently pled a breach of contract claim against Daddy Yankee and El Cartel.[3] Accordingly, it is

ORDERED that Defendants' Motion to Dismiss Amended Complaint [DE-48] is DENIED. Defendants shall file an Answer to the Amended Complaint by **March 1, 2013.**

DONE and ORDERED in Miami, Florida, this 19th day of February, 2013.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc: All Counsel of Record

---

[3] Based on the clear language of the contract, New York law, and the parties' admissions, the Court finds that the motion to dismiss Count I was not well-taken. In the future, the Court expects that Defendants will raise only legitimate arguments. If Defendants continue to raise such frivolous arguments, the Court will consider imposing sanctions on Defendants and their counsel.

15