# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 11–CV–24142–Seitz/Simonton

FIVE FOR ENTERTAINMENT S.A., d/b/a FIVE
LIVE ENTERTAINMENT and DIEGO HERNAN
DE IRAOLA,

        Plaintiffs,

  -against-

RAMON LUIS AYALA RODRIGUEZ a/k/a/
DADDY YANKEE, EL CARTEL RECORDS
INC., ICARO SERVICES INC., and EDGAR
BALDIRI MARTINEZ,

        Defendants.

-----------------------------------------------------------------x

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

**WINSTON & STRAWN LLP**
Eric W. Bloom (*pro hac vice*)
Tomas Leonard (*pro hac vice*)
Margaret Ciavarella (*pro hac vice*)

1700 K Street N.W.
Washington, D.C. 20006-3817
Tel: (202) 282–5000
Fax: (202) 282–5100
ebloom@winston.com
tleonard@winston.com
mciavarella@winston.com

**ASSOULINE & BERLOWE, P.A.**
Peter E. Berlowe (FBN 143650)
Daniel E. Vielleville (FBN 940496)
L Andrew S. Riccio (FBN 91978)

3250 Mary Street, Suite 308
Miami, Florida 33133
Tel:  (305) 567-5576
Fax:  (305) 567-9343

*Attorneys for Plaintiffs Five for Entertainment S.A, d/b/a
Five Live Entertainment and Diego Hernán de Iraola*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS .....................................................................................1

ARGUMENT ......................................................................................................1

    I.    Standard of Review...............................................................................1

    II.    Defendants Breached The Engagement Contract .......................................2

        A.    The Engagement Contract Is Valid and Binding on the Parties.....................................................................................2

        B.    There Is No Factual Dispute That the Parties Modified the Payment Schedule Set Forth in the Engagement Contract ...........2

        C.    Plaintiffs Performed Their Contractual Obligations ......................3

        D.    Defendants Breached the Engagement Contract............................3

        E.    Plaintiffs Sustained Damages as a Result of Defendants' Breach ............................................................................4

        F.    Defendants Cannot Justify Their Breach of the Engagement Contract Based On Plaintiffs' Alleged Nonperformance ............4

    III.    Defendants Breached the Second Contract...............................................4

        A.    The Second Contract Is Valid and Binding on the Parties.........................4

        B.    Plaintiffs Performed Their Contractual Obligations ......................5

        C.    Defendants Breached the Second Contract...................................6

        D.    Plaintiffs Sustained Damages as a Result of Defendants' Breach ............................................................................7

    IV.    Defendants Unlawfully Defamed Plaintiffs................................................7

    V.    Defendants Conspired to Defame Plaintiffs ............................................10

    VI.    Defendants Committed Injurious Falsehood by Claiming that De Iraola Was Not Associated with Five Live and by Conspiring with Argentine Businessmen ......................................................................10

    VII.    Defendants' Ongoing Practice of Abusive Conduct Resulting in the Forfeiture of Sums Deposited by Producers Presents a Clear Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")...................................................................................11

    VIII.    Defendants' Defamation Counterclaims Fail as a Matter of Law .......................13

    IX.    Defendants' Breach of Engagement Contract Counterclaim Fails As A Matter of Law ..............................................................................15

X.     Defendants' Breach of Second Contract Counterclaim Fails As A Matter Of Law ........................................................................15

XI.    Defendants' Promissory Estoppel Counterclaim Fails as a Matter of Law ........................................................................16

XII.   Most of Defendants' Affirmative Defenses ("Defenses") Fail as a Matter of Law ........................................................................17

      A.    Contract Defenses ........................................................17

      B.    Defamation Defenses ....................................................18

      C.    Civil Conspiracy to Defame Defenses ........................20

      D.    Injurious Falsehood Defenses ......................................20

      E.    Other Defenses Fail or Were Withdrawn......................20

CONCLUSION........................................................................20

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**CASES**

*A.H.A. General Construction, Inc. v. New York City Housing Authority,*
   92 N.Y.2d 20 (1998) ...........................................................................................5, 15

*Abram v. Odham,*
   89 So. 2d 334 (Fla. 1956)...........................................................................................19

*AmerisourceBergen Drug Corp. v. Izz & Sons, Inc.,*
   No. 11–cv–23895, 2012 WL 3757049 (S.D. Fla. Aug. 28, 2012)...........................................1

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)...........................................................................................1

*Axelrod v. Califano,*
   357 So. 2d 1048 (Fla. 1st DCA 1978) .......................................................................9

*Bald Mountain Park, Ltd. v. Oliver,*
   863 F.2d 1560 (11th Cir. 1989) .......................................................................1

*Barsotti's Inc. v. Consolidated Edison Company of New York, Inc.,*
   254 A.D.2d 211 (1st Dep't 1998) .......................................................................2

*Belli v. Orlando Daily Newspapers, Inc.,*
   389 F.2d 579 (5th Cir. 1967) .......................................................................10

*Bothmann v. Harrington,*
   458 So. 2d 1163 (Fla. 3d DCA 1984) ...........................................................10, 11

*Burger King Corp. v. Weaver,*
   169 F.3d 1310 (11th Cir. 1999) .......................................................................2

*Cape Publications, Inc. v. Reakes,*
   840 So. 2d 277 (Fla. 5th DCA 2003) .......................................................................13

*CareerFairs.com v. United Bus. Media LLC,*
   838 F. Supp. 2d 1316 (S.D. Fla. 2011) .......................................................................11

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)...........................................................................................1

*Chase v. Skoy,*
   146 A.D.2d 563 (2d Dep't 1989) .......................................................................2

*City First Mortgage Corp. v. Barton*,
    988 So. 2d 82 (Fla. 4th DCA 2008) ...................................................................... passim

*Clearmont Prop., LLC v. Eisner*,
    58 A.D.3d 1052 (3d Dep't 2009) .....................................................................................2

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*,
    74 N.Y.2d 475 (1989) .....................................................................................................4

*Collier County Publishing Co. v. Chapman*,
    318 So. 2d 492 (Fla. 2d DCA 1975) ..............................................................................11

*Falic v. Legg Mason Wood Walker, Inc.*,
    347 F. Supp. 2d 1260 (S.D. Fla. 2004) .....................................................................18, 19

*Fried v. Stiefel Labs., Inc.*,
    No. 11-CV-20853, 2012 WL 4364300 (S.D. Fla. June 8, 2012) ...................................16

*From v. Tallahassee Democrat, Inc.*,
    400 So. 2d 52 (Fla. 1st DCA 1981) ...............................................................................14

*Gargiulo v. G.M. Sales, Inc.*,
    131 F.3d 995 (11th Cir. 1997) .........................................................................................1

*Gates v. Utsey*,
    177 So. 2d 486 (Fla. 1st DCA 1965) .........................................................................10, 11

*Glusman v. Lieberman*,
    285 So. 2d 29 (Fla. 4th DCA 1973) ...............................................................................11

*Great American Assurance Co. v. Sanchuk, LLC*,
    No. , 2012 WL 5306354 (M.D. Fla. Oct. 26, 2012) ......................................................16

*Greenspan v. Amsterdam*,
    145 A.D.2d 535 (2d Dep't 1988) ....................................................................................15

*Hay v. Independent Newspapers, Inc.*,
    450 So. 2d 293 (Fla. 2d DCA 1984) ..............................................................................18

*Hoch v. Rissman, Weisberg, Barrett*,
    742 So. 2d 451 (Fla. 5th DCA 1999) .......................................................................9, 10, 11

*In re Gosman*,
    382 B.R. 826 (Bankr. S.D. Fla. 2007) ............................................................................16

*JI-EE Industries Co. v. Paragon Metals, Inc.*,
    No. 09-81590-CIV, 2010 WL 1141103 (S.D. Fla. Mar. 23, 2010) ...............................16

*Johnson v. Clark*,
　484 F. Supp. 2d 1242 (M.D. Fla. 2007)................................................................9

*Kooleraire Service & Installation Corp. v. Board of Education*,
　28 N.Y.2d 101 (1971) ........................................................................5, 15

*Lawnwood Medical Ctr. v. Sadow*,
　43 So. 3d 710 (Fla. 4th DCA 2010) ..................................................................9

*Lehman v. Goldin*,
　36 So. 2d 259 (Fla. 1948)................................................................................10

*Linafelt v. Beverly Enters.-Fla., Inc.*,
　745 So. 2d 386 (Fla. 1st DCA 1999) ..............................................................13

*Lundquist v. Alewine*,
　397 So. 2d 1148 (Fla. 5th DCA 1981) ..............................................................9

*Mangravite v. University of Miami*,
　838 F. Supp. 2d 1326 (S.D. Fla. 2011) ...........................................................16

*Miami Herald Publication Co. v. Brautigam*,
　127 So. 2d 718 (Fla. 3d DCA 1961) ...............................................................19

*Moynet v. Courtois*,
　8 So. 3d 377, 379 (Fla. 3d DCA 2009) ...........................................................16

*Muhlstock v. Cole*,
　245 A.D.2d 55 (1st Dep't 1997) ........................................................................5

*Murphy v. City of Aventura*,
　No. 08–20603–CIV, 2008 WL 4540055 (S.D. Fla. Oct. 10, 2008).........................10

*North American Clearing, Inc. v. Brokerage Comp. Servs., Inc.*,
　666 F. Supp. 2d (M.D. Fla. 2009) ...................................................................12

*Nationwide Mutual Co. v. Ft. Myers Total Rehab Center*,
　657 F. Supp. 2d 1279 (M.D. Fla. 2009)...........................................................11

*Old Plantation Corp. v. Maule Industries, Inc.*,
　68 So. 2d 180 (Fla. 1953)................................................................................10

*Ortega Trujillo v. Banco Central Del Ecuador*,
　17 F. Supp. 2d 1334 (S.D. Fla. 1998) ............................................................19

*Pelc v. Nowak*,
　No. 8:11–CV–79–T–17TGW, 2012 WL 2568150 (M.D. Fla. July 2, 2012) .........................7, 9

*Five Live Entertainment, et al. v. Ramon Luis Ayala Rodriguez, et al.*
Case No. 11–CV–24142 Seitz/Simonton

*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*,
    842 So. 2d 773 (Fla. 2003)..............................................................................11, 12

*Razner v. Wellington Regional Medical Center, Inc.*,
    837 So. 2d 437 (Fla. 4th DCA 2002) ......................................................13, 14, 18

*Recon Car Corp. v. Chrysler Corp.*,
    130 A.D.2d 725 (2d Dep't 1987) ...............................................................................2

*Rose v. Spa Realty Assoc.*,
    42 N.Y.2d 338 (1977) ................................................................................................2

*Samuels v. King Motors Co. of Fort Lauderdale*,
    782 So. 2d 489 (Fla. 4th DCA 2001) .....................................................................12

*Saunders Hardware Five & Ten v. Low*,
    307 So. 2d 893 (Fla. 3d DCA 1975) .........................................................................9

*Scholz v. RDV Sports, Inc.*,
    710 So. 2d 618 (Fla. 5th DCA 1998) ................................................................18, 19

*Scott v. Bush*,
    907 So. 2d 662 (Fla. 5th DCA 2005) ......................................................................18

*Signature Pharmacy, Inc. v. Soares*,
    No. 6:08–cv–1853–Orl–31GJK, 2010 WL 8400118 (M.D. Fla. July 1, 2010) ..................7, 10

*Spovero v. Miller*,
    404 So. 2d 793 (Fla. 3d DCA 1981) .........................................................................9

*State Farm Fire & Cas. Ins. Co. v. Ortiz*,
    560 So. 2d 1350 (Fla. 3d DCA 1990) .....................................................................17

*U.S. v. Wallace & Wallace Fuel Oil Co.*,
    540 F. Supp. 419 (S.D.N.Y. 1982) .........................................................................17

*W.R. Grace & Co. v. Geodata Servs., Inc.*,
    547 So. 2d 919 (Fla. 1989).....................................................................................16

*Weight-Rite Gold Corp. v. U.S. Golf Association*,
    766 F. Supp. 1104 (S.D. Fla. 1991) .......................................................................14

*White Holding Co. v. Martin Marietta Materials, Inc.*,
    423 Fed. App'x 943 (11th Cir. 2011) ......................................................................16

*Wolfson v. Kirk*,
    273 So. 2d 774 (Fla. 4th DCA 1973) ........................................................................9

*Five Live Entertainment, et al. v. Ramon Luis Ayala Rodriguez, et al.*
**Case No. 11–CV–24142 Seitz/Simonton**

*Zell-Breier v. Independent Order of Foresters*,
No. 6:11–cv–1566–Orl–28TBS, 2012 WL 6089713 (M.D. Fla. Dec. 7, 2012) ........................1

*Zurich Am. Ins. v. Frankel Enters.*,
287 Fed. App'x 775 (11th Cir. 2008) ......................................................................................16


STATUTES

Fla. Stat. § 501.202(2) (2006) ..........................................................................................................11

Fla. Stat. § 501.204(1) ......................................................................................................................12

## PRELIMINARY STATEMENT

Plaintiffs Five for Entertainment S.A., d/b/a Five Live Entertainment ("Five Live"), and Diego Hernán de Iraola ("De Iraola," and collectively with Five Live, "Plaintiffs") respectfully submit this memorandum of law in support of their Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## STATEMENT OF FACTS

Plaintiffs respectfully refer the Court to their Statement of Facts submitted pursuant to Local Rule 56.1 (the "56.1 Statement") for a full recitation of pertinent and undisputed facts.

## ARGUMENT

### I.  <u>Standard of Review</u>

A moving party is entitled to summary judgment as a matter of law where the pleadings and supporting materials establish that there is no genuine issue as to material fact.  Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "genuine" only if it will "affect the outcome of the suit under the governing [substantive] law." *Anderson*, 477 U.S. at 248.  The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported summary judgment motion. *See Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989).

In deciding a summary judgment motion, the Court "must be mindful of the purpose of Rule 56, which is to eliminate the needless delay and expense to the parties and to the Court occasioned by an unnecessary trial.  Consequently, the non-moving party cannot merely rest upon his bare assertions, conclusory allegations, surmises or conjectures." *AmerisourceBergen Drug Corp. v. Izz & Sons, Inc.*, No. 11–cv–23895, 2012 WL 3757049, at *3 (S.D. Fla. Aug. 28, 2012) (citing *Celotex*, 477 U.S. at 322–23).  Far from serving as "a disfavored procedural shortcut," *Celotex*, 477 U.S. at 327, summary judgment must be granted unless the non-moving party "come[s] forward with specific factual evidence, presenting more than mere allegations" to present a material factual dispute. *Zell-Breier v. Independent Order of Foresters*, No. 6:11–cv–1566–Orl–28TBS, 2012 WL 6089713, at *1 (M.D. Fla. Dec. 7, 2012) (quoting *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997)); *see also Celotex*, 477 U.S. at 322.

As this Circuit has observed, "[the summary judgment] standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the

*Five Live Entertainment, et al. v. Ramon Luis Ayala Rodriguez, et al.*
Case No. 11–CV–24142 Seitz/Simonton

verdict." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1321 (11th Cir. 1999).  "If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself . . . whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* (quoting *Anderson*, 477 U.S.at 252).

## II.    Defendants Breached The Engagement Contract

The elements of a breach of contract claim under New York law[1] are (a) a valid contract, (b) performance by the plaintiff, (c) a material breach, and (d) damages.  *Clearmont Prop., LLC v. Eisner*, 58 A.D.3d 1052, 1055 (3d Dep't 2009).

### A.    The Engagement Contract Is Valid and Binding on the Parties

Defendants admit in their RFAs[2] that the Engagement Contract is valid and binding on the parties.  *See* Ex. 12 ¶¶ 9, 11; Ex. 13 ¶ 13; Ex. 14 ¶¶ 11, 13; Ex. 15 ¶¶ 10-11.

### B.    There Is No Factual Dispute That the Parties Modified the Payment Schedule Set Forth in the Engagement Contract

New York law permits modification or elimination of contractual provisions by way of an oral agreement or course of conduct.  *Barsotti's Inc. v. Consol. Edison Co. of N.Y., Inc.*, 254 A.D.2d 211, 212 (1st Dep't 1998); *Chase v. Skoy*, 146 A.D.2d 563, 565 (2d Dep't 1989); *Recon Car Corp. v. Chrysler Corp.*, 130 A.D.2d 725, 729 (2d Dep't 1987).  This is so even when the written contract *specifically prohibits* oral modifications, *Rose v. Spa Realty Assoc.*, 42 N.Y.2d 338, 343 (1977), though here there are no such contractual limitations.  *See generally* Exs. 6, 17.

The summary judgment record indisputably establishes that, over the course of nearly six months, De Iraola continuously made, and Baldiri always accepted, payments that deviated from the schedule set forth in the Engagement Contract.[3]  This Court may therefore conclude as a matter of law that Baldiri (on behalf of Daddy Yankee and El Cartel)[4] waived the Engagement Contract's specifications as to form and timing of payments.

---

[1]    New York law applies to the parties' contract claims.  *See* Ex. 6 ¶ 7; Ex. 17 ¶ 7.  All exhibits referenced are attached to Plaintiffs' 56.1 Statement.

[2]    All defined terms have the same meanings assigned to them in Plaintiffs' 56.1 Statement.

[3]    *See* 56.1 Statement ¶¶ 11-13; Ex. 6 at 1-2; Answer ¶ 28; Ex. 7; Ex. 8.

[4]    Defendants concede that Baldiri had full authority from El Cartel and Daddy Yankee to change the payment schedule set forth in the Engagement Contract.  Ex. 4 at 46:3–7, 64:17–19,

*Five Live Entertainment, et al. v. Ramon Luis Ayala Rodriguez, et al.*
Case No. 11–CV–24142 Seitz/Simonton

### C.  Plaintiffs Performed Their Contractual Obligations

Under the Engagement Contract, Plaintiffs were obligated (1) to make all arrangements for a six-concert tour, and (2) to pay money to Defendants.  They did both.

There is no dispute that the Plaintiffs did all the necessary work to produce the concerts. Over the course of six months, and hundreds of man-hours, Plaintiffs ensured that venues were booked; lighting, sound, and technical equipment was procured; the tour was heavily advertised; flight and ground transportation arrangements were made; visas were procured; hotels were reserved; and meals were arranged.[5]  In furtherance of their responsibilities, Plaintiffs paid no less than $500,000—either directly or through local producers—to make these arrangements.[6] Upwards of 78,000 people were expected to attend these six concerts (an average of 80% of the total capacity at the chosen venues).[7]  None of Plaintiffs' payments in furtherance of these contractual responsibilities is in dispute.

Nor is there any dispute that Plaintiffs:  (1) paid nearly US$800,000.00 through wire transfers and in cash to Baldiri, (2) Plaintiffs incurred additional expenses on Daddy Yankee's behalf and applied these expenses against the contract price;[8] (3) Baldiri accepted and deposited each payment without objection; and (4) all such payments were received prior to the cancellation of the concerts.  *See* Ex. 7; Ex. 2 at 103:5-17; Ex. 9 ¶ 28; Answer ¶ 28.

### D.  Defendants Breached the Engagement Contract

Despite Plaintiffs' performance, Defendants materially breached the parties' agreement by cancelling all six of the planned shows just days before the tour was to begin.  *See* Ex. 12 ¶ 25; Ex. 13 ¶¶ 30, 32; Ex. 14 ¶¶ 38, 40; Ex. 15 ¶ 33; Answer ¶ 120, while retaining all of the payments made to them.

---

65:22–66:2; Ex. 5 at 35:7–19, 50:2–8.  Baldiri did so immediately, advising De Iraola at the time Baldiri sent him the contract that he would not object to De Iraola splitting the payments into smaller amounts and paying on a rolling basis.  Ex. 8.  De Iraola acted on this offer, making thirteen total payments—not the contracted-for *four* installment payments—in varying amounts for a total of approximately $800,000.  56.1 Statement ¶ 11; Ex. 7.

[5]    56.1 Statement ¶ 15; Ex. 10 ¶¶ 3, 14, 34, 47, 70, 84, 128; Ex. 9 ¶¶ 7-9. 11, 14-16.

[6]    Ex. 10 ¶ 128.

[7]    Ex. 9 ¶ 18.

[8]    Specifically, the remaining $20,000 of the contract price was discharged by way of a setoff against funds that De Iraola had paid out of pocket to reschedule flights missed by Daddy Yankee and his entourage during the September 2010 tour.  56.1 Statement ¶ 14; Ex. 9 ¶ 28.

### E.       Plaintiffs Sustained Damages as a Result of Defendants' Breach

While the *amount* of damages may be reserved for trial, for purposes of summary judgment there can be no genuine dispute regarding the *fact* that Plaintiffs suffered *some* injury. Plaintiffs paid Defendants approximately $800,000 that has not been returned; Plaintiffs also expended substantial amounts to produce the six shows for which they have not been reimbursed.  None of this is disputed.  Plaintiffs have suffered other injury, including lost profits and severe damage to business reputation.[9]

### F.       Defendants Cannot Justify Their Breach of the Engagement Contract Based On Plaintiffs' Alleged Nonperformance

Defendants maintain that Plaintiffs' own purported breach excused them from their obligation to perform the concerts as agreed.  Answer 1st & 2nd  Aff. Defs. at pp. 27-28. Defendants take issue with two specific aspects of Plaintiffs' performance.

*First*, as reflected in Defendants' Answers and Counterclaims, Defendants allege that Plaintiffs failed to obtain the necessary visas for Daddy Yankee to travel to Argentina to perform.  *Id.*  2d Aff. Def., p. 28.  The *evidence* shows that Plaintiffs in fact procured the necessary visas.  Ex. 9 ¶ 26.  *Second*, while Defendants contest payment, in fact the *evidence* establishes that Plaintiffs paid $800,000 in cash and $20,000 in in-kind contributions.[10]  Each of these payments was accepted by Defendants.

## III.   Defendants Breached the Second Contract

### A.       The Second Contract Is Valid and Binding on the Parties

To succeed on a breach of oral contract claim, the movant must establish that the contract's terms are definite, keeping in mind that definiteness is "flexible, varying for example with the subject of the agreement, its complexity, the purpose for which the contract was made, the circumstances under which it was made, and the relation of the parties."  *Cobble Hill Nursing*

---

[9]      Plaintiffs' experts assessed discrete damages and lost profits for a total of $1,811,385 at November 2010 values (including contingent liabilities *vis a vis* local producers for approximately $191,000 at November 2010 values.)  Ex. 10. at ¶¶ 126, 128.  The impact of Defendants' cancellation of the 2010 Tour was of such magnitude that it effectively forced Five Live's business operations into a sudden and complete halt.  Plaintiffs' experts concluded that Plaintiffs' lost profits arising from the loss of business reputation and severed relationships with local vendors/producers amounted to $4,485,558 at November 2010 values.  *Id.* ¶¶ 84-85, 126.

[10]      56.1 Statement ¶ 11, 14; Ex. 7.

*Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482-83 (1989); *see also Muhlstock v. Cole*, 245 A.D.2d 55, 58 (1st Dep't 1997).

The Parties agreed on the material and definite terms of the Second Contract: (1) They added four concerts to the tour on specific dates and at specific venues, *see* Ans. ¶¶ 104; Counterclaims ¶¶ 16-17, 21; Ex. 17 §§ 1, 3; and (2) they agreed on the contract price. Ex. 17 § 5; Counterclaims ¶ 20.

### B.   Plaintiffs Performed Their Contractual Obligations

Like the Engagement Contract, Plaintiffs were obligated under the Second Contract to make all arrangements for an additional four concerts. *See* Ex. 6, Ex. 17. Again, there is no dispute that the Plaintiffs did all the work necessary to produce the concerts. Ex. 2 at 78:6-9; Ex. 9 ¶¶ 7-9. 11, 14-16.

Plaintiffs were also obligated to pay money to Defendants, Ex. 17, but Defendants prevented them from doing so. Under well-settled New York law, as well as pure common sense, "a party to a contract 'cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition.'"[11]

While timing of the payments was not a particular concern at the time of the original agreement, Ex. 2 at 138:21-139:3, the parties did agree that final payment would be made only upon Daddy Yankee's arrival in Argentina, thus easing Plaintiffs' concern that Baldiri would seek extra-contractual concessions for lack of "timely" payment. Ex. 9 ¶ 20. However, just days after Baldiri publicly announced on November 5, 2010, that the 2010 Tour, including the four additional shows provided for in the Second Contract, would be rescheduled and commence on November 19, 2010, *see* 56.1 Statement ¶¶ 10, 22, n. 34, Baldiri and Mireddys Gonzalez, CEO of El Cartel, demanded payment in full of all amounts due *prior* to Daddy Yankee's arrival in Argentina. De Iraola generally insisted on adhering to the original agreement, but he ultimately offered alternative methods of delivering payment to Defendants prior to Daddy Yankee's arrival in Argentina. Baldiri and Ms. Gonzalez rejected *all* of them without cause. 56.1 Statement ¶ 23.

Specifically, on November 13, De Iraola offered to send someone to Miami to hand-deliver a cashiers' check equal to all amounts owed so that Baldiri would receive the payment on Tuesday, November 16—the day before Daddy Yankee was due to arrive in Argentina. Ex. 25.

---

[11]   *A.H.A. Gen. Const., Inc. v. N.Y. City Hous. Auth.*, 92 N.Y.2d 20, 30 (1998) (quoting *Kooleraire Serv. & Installation Corp. v. Bd. of Educ.*, 28 N.Y.2d 101, 106 (1971)).

*Five Live Entertainment, et al. v. Ramon Luis Ayala Rodriguez, et al.*
**Case No. 11–CV–24142 Seitz/Simonton**

Baldiri replied the same day, refusing the offer and threatening to cancel the tour in full if he did not receive the payment by 4 P.M. on Monday the 15th. *Id.* De Iraola then asked Baldiri to allow Ms. Daira Escobar (Icaro's employee and person of trust who was scheduled to travel to Argentina a few days ahead of Daddy Yankee and his crew and whose ticket was already paid for) to travel to Argentina so she could accompany De Iraola to make the wire transfer to Icaro and certify that payment was on its way, even though it might not be credited in Icaro's account until after November 15.[12]  This option was also rejected. Ex. 2 at 197:11-25; Ex. 26.

Having rebuffed De Iraola's prior attempts to provide payment before Daddy Yankee's arrival in Argentina, Mireddys Gonzalez emailed De Iraola on November 16, 2010, informing him that the concerts would be cancelled if the payments were not made by the next day. Ex. 27. De Iraola was by then out of viable options.  In fact, Ms. Gonzalez subsequently testified that she was not willing to accept any of De Iraola's payment offers at that point, stating that even payment in Miami *in cash* would not have been acceptable to her, "[b]ecause it wasn't, because we were short on time to be able to deposit that money and have everything be as it should be in order for us to leave on the trip." Ex. 4 at 132:13-16.  But when asked whether there was a reason the money needed to be immediately available, for instance to pay suppliers or staff, she replied that there was none. *Id.* at 133:11-14.  Defendants' refusal to accept Plaintiffs' payment in any of the different forms in which it was offered precludes them now from relying on Plaintiffs' "nonpayment" as justification for their breach.

Defendants' position comes down to this:  Having already received payment in full for six concerts, *their own refusal* to accept payment for the remaining four concerts justified them cancelling not one show, but instead the entire tour, notwithstanding Plaintiffs' respective alternative offers of full payment, and notwithstanding the substantial cash outlay already made to make the tour possible.  This is precisely the sort of absurd result that the doctrine of prevention is intended to avoid.

### C.  Defendants Breached the Second Contract

Despite Plaintiffs' performance of their obligation to make all arrangements necessary to produce an additional four concerts under the Second Contract, and despite their affirmative

---

[12]    International wire transfers can take several days to credit in the recipient's account.  In fact, Plaintiffs' wire transfers had previously taken up to five days to credit in Icaro's bank account. Ex. 9 ¶ 24 n.1.

efforts to pay the contract price in full notwithstanding the parties' initial agreement regarding timing of such payment, Defendants chose to prevent Plaintiffs from complying with their payment obligations and cancel the planned shows just days before the tour was to begin. *See* discussion *supra* at 6-8; Ex. 12 ¶ 25; Ex. 13 ¶¶ 30, 32; Ex. 14 ¶¶ 38, 40; Ex. 15 ¶ 33.

### D. Plaintiffs Sustained Damages as a Result of Defendants' Breach

The fact of injury arising from Defendants' breach of the Second Contract is not genuinely in dispute. Plaintiffs' experts assessed discrete damages and lost profits arising from this breach at no less than $235,451 at November 2010 values. Ex. 10. at ¶¶ 126, 128.

## IV. Defendants Unlawfully Defamed Plaintiffs

Defamation requires (a) publication to a third party (b) of a false statement, where the (c) actor must act at least negligently in publishing material concerning a private person, (d) resulting in actual damages to the plaintiff, and (e) the statement must be defamatory. *Pelc v. Nowak*, No. 8:11–CV–79–T–17TGW, 2012 WL 2568150, at *2 (M.D. Fla. July 2, 2012); *Signature Pharmacy, Inc. v. Soares*, No. 6:08–cv–1853–Orl–31GJK, 2010 WL 8400118, at *1 (M.D. Fla. July 1, 2010) (citations omitted).

*Publication*. Defendants jointly knew of, reviewed, and approved the Press Release for publication on Daddy Yankee's and Icaro's websites. Ex. 12 ¶¶ 27, 30–31; Ex. 13 ¶¶ 34–35, 37–38; Ex. 14 ¶¶ 42–47, 49; Ex. 15 ¶¶ 36–41; *see also* Ex. 4 at 99:13–100:19; Ex. 5 at 78:24–79:3, 79:12–80:17, 83:9–23, 84:15–23, 85:5–14. Icaro drafted and widely distributed the Press Release on behalf of all Defendants on November 17, 2010. Ex. 14 ¶ 50; Ex. 15 ¶¶ 34, 44; Ex. 34 at 62:14–63:17, 63:20–25; *see also* Ex. 3 at 205:6–207:2; Ex. 4 at 102:8–14, 105:8–107:6 (admitting Baldiri was authorized to state the De Iraola "swindled" Daddy Yankee). "[I]t was the decision of Icaro, of El Cartel, and myself to publish this press release to inform the audience, to let them know that this is what I do," with the intent to create a "massive" distribution. Ex. 5 at 84:24–85:4, 86:16–22.

During the relevant time period, Baldiri "represented the interests of the artist and his brand" and was thus fully authorized to publish "any statements . . . publicly regarding Daddy Yankee." Ex. 4 at 149:16–24, 150:8–16; Ex. 5 at 88:22–90:2. Daddy Yankee and El Cartel approved subsequent press releases issued by Baldiri/Icaro. *See* Ex. 34 at 64:22–63:13. Pursuant to his authority, and after discussing several upcoming interviews with Daddy Yankee, Baldiri made various statements to Argentine media outlets between November 17 and 27, 2010.

Ex. 2 at 206:15–207:13; Ex. 3 at 203:15–205:3, 212:2–15; Ex. 5 at 88:2–9.  Daddy Yankee approved these statements as being in his best interests.  Ex. 5 at 99:3–16.

In a November 26, 2010 press release, Baldiri accused De Iraola of forging his signature in contracts with local promoters and of stealing approximately $517,000.  Ex. 3 at 218:7–9, 219:12–223:8, 223:23–224:25, 250:25–20; Ex. 32.  He further represented that De Iraola "swindled" Daddy Yankee.  Ex. 3 at 247:16–19, 248:16–22; Ex. 32.  Later, in a press release dated January 3, 2011, Baldiri claimed that De Iraola was not part of Five Live, basing this statement solely on information that he heard from both a man who allegedly worked for Five Live and an unverified e-mail from Five Live.  Ex. 3 at 212:19–21, 213:23–215:17; Ex. 31.

*False & Reckless*.  The statements are materially false and were at least recklessly made. Publishers accurately reflected Baldiri's interview statements.  *See* Ex. 34 at 74:1–8.  The representation of fact that De Iraola was not part of Five Live is demonstrably false.  De Iraola has been the majority owner of Five Live since May 2010, and at all relevant times had ample powers to act on behalf of the company.  *See* Ex. 1; Ex. 2 at 13:14–14:20, 39:3–5; Ex. 9 ¶¶ 1-2. Rather than obtaining the relevant corporate documents or conducting any due diligence, Mireddys, Baldiri, and Ms. Gonzalez chose to publish this false statement on the basis of a stranger's e-mail and phone call after the tour cancellation.  *See* Ex. 3 at 215:20–216:15, 217:4– 218:6; Ex. 4 at 108:15–109:16; Ex. 34 at 74:25–75:14.  To this day, Defendants have neither verified—nor could they because the statement is false—nor disavowed the statement that De Iraola was not part of Five Live.  Ex. 3 at 247:5–15.

The representation of fact that De Iraola "forged" Baldiri's signature on contracts with local promoters, producers, or any other person is likewise false.  It never happened and there is no evidence to support the allegation.  At all times De Iraola signed contracts only on behalf of Five Live.  Ex. 2 at 32:11–34:11.

As shown above, Defendants' representation that the concerts were cancelled as a result of Plaintiffs' alleged noncompliance with the contractual terms is also false; rather, *Defendants* unilaterally cancelled the contracts even though Plaintiffs were able, willing, and *wanting* to pay and perform their duties.  *See* Ex. 2 at 208:6–209:10, 207:14–20.  Nor was there any money to steal.  It was the Plaintiffs who paid money to Defendants—not the other way around.

*Damages*.  Plaintiffs have suffered damages as a result of Defendants' *per se* defamatory statements.  Statements are defamatory *per se* against a person if they "tend to degrade him,

bring him into ill repute, destroy confidence in his integrity, or cause other like injury," "falsely and maliciously charge[] another with the commission of a crime," or otherwise "impute[] to another conduct, characteristics[,] or a condition incompatible with the proper exercise of his lawful business, trade, profession[,] or office." *Hoch v. Rissman, Weisberg, Barrett*, 742 So. 2d 451, 457 (Fla. 5th DCA 1999); *Axelrod v. Califano*, 357 So. 2d 1048, 1050 (Fla. 1st DCA 1978).

General reputation damages are presumed "without special proof" in slander *per se* actions.[13]  Here, Defendants accused De Iraola of crimes—theft and forgery—which are defamatory *per se*.  *Axelrod*, 357 So. 2d at 1050 ("[T]he alleged publication branding [plaintiff] a thief and forger was actionable per se, and, as such, raised a presumption of malice as a matter of law.").  Moreover, their statement that De Iraola was not part of Five Live imputes on him characteristics (*i.e.*, of being a deceiver and forger) "incompatible with the proper exercise of his lawful business," because his ability to conduct his business properly arises from his ownership of and good title to it.  *See Hoch*, 742 So. 2d at 457.

Businesses and individuals who previously did business with Plaintiffs stopped all contact with them, including Hector Marcelli, Marcelo Giglio, and a company called Phoenix. Ex. 2 at 46:6-12, 218:1-219:7.  They instructed De Iraola to "clean up [his] image" before working with them.  Ex. 2 at 220:2-8.  "These press releases and their libelous comments significantly harmed my image as an artificial person as well.  Because in my activity and in this type of business all of the negotiations were centered in my person and upon being involved in an issue of this scope and having been slandered many of my relationships were disrupted."  Ex. 2 at 217:19-25.  De Iraola never worked under the name "Five Live" after the cancellation and publication of the defamatory statements, even though the name had been prosperous and lucrative before the 2010 tour.   Ex. 2 at 47:2-19, 48:2-11, 51:1-6, 51:18-25, 85:1-87:24. Plaintiffs are entitled to punitive, compensatory, and reputation damages.

---

[13]     *See Johnson v. Clark*, 484 F. Supp. 2d 1242, 1254 (M.D. Fla. 2007); *Pelc*, No. 8:11–CV–79–T–17TGW, 2012 WL 2568150, at *2; *Spovero v. Miller*, 404 So. 2d 793, 794 (Fla. 3d DCA 1981); *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. 4th DCA 1973).  There is instead a "presumption of injury which arises from a showing of libel or slander that is actionable per se," and punitive damages are available.  *Lundquist v. Alewine*, 397 So. 2d 1148, 1150 (Fla. 5th DCA 1981) (quoting *Saunders Hardware Five & Ten v. Low*, 307 So. 2d 893 (Fla. 3d DCA 1975)); *Lawnwood Med. Ctr. v. Sadow*, 43 So. 3d 710 (Fla. 4th DCA 2010).

## V.   Defendants Conspired to Defame Plaintiffs

Defendants are liable for civil conspiracy to defame if, in addition to the above, they (a) conspired to defame Plaintiffs, (b) committed an overt act in furtherance of the conspiracy, and (c) Plaintiffs incurred damages as a result of Defendants' actions.[14]

As described above, Defendants worked jointly on and approved the Press Release and other defamatory statements.[15]  In furtherance of the campaign against Plaintiffs, and on behalf of his co-defendants, Baldiri met with two Argentine producers in Miami to plan an additional press release to further slander De Iraola's character, but the two businessmen refused.  Ex. 3 at 227:2–24, 228:18–229:17, 230:20–231:17; Ex. 4 at 117:25–118:17.  Both Mireddys and Daddy Yankee approved of the smear campaign.  Ex. 4 at 113:12–115:5, 119:9–120:8.  The publication of the Press Release, the repeated publications of the defamatory statements, and the meeting with the two Argentine businessmen all constitute overt acts in furtherance of the conspiracy.  Damages have already been established above.  *See* discussion *supra* at Part IV.

## VI.   Defendants Committed Injurious Falsehood by Claiming that De Iraola Was Not Associated with Five Live and by Conspiring with Argentine Businessmen

Injurious falsehood is established upon a showing of "[a] falsehood [b] [that] has been published, or communicated to a third person [c] when the defendant-publisher knows or reasonably should know that it will likely result in inducing others not to deal with the plaintiff and [d] in fact, the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff; and [e] special damages are proximately caused as a result of the published falsehood."[16]  Under Florida law, a false statement is presumptively malicious if all other elements of the tort are established, *see Bothmann*, 458 So. 2d at 1168 n. 3.  Any legally

---

[14]     *See, e.g.*, *Belli v. Orlando Daily Newspapers, Inc.*, 389 F.2d 579, 587 (5th Cir. 1967) (citation omitted); *Murphy v. City of Aventura*, No. 08–20603–CIV, 2008 WL 4540055, at *7 (S.D. Fla. Oct. 10, 2008) (quoting *Hoch*, 742 So. 2d at 460).

[15]     Ex. 12 ¶¶ 27, 30–31; Ex. 13 ¶¶ 34–35, 37–38; Ex. 14 ¶¶ 42–47, 49; Ex. 15 ¶¶ 36–41; *see also* Ex. 4 at 99:13–100:19; Ex. 5 at 78:24–79:3, 79:12–80:17, 83:9–23, 84:15–23, 85:5–14.

[16]     *Bothmann v. Harrington*, 458 So. 2d 1163, 1168 (Fla. 3d DCA 1984); *see also Signature Pharmacy, Inc.*, No. 6:08–cv–1853–Orl–31GJK, 2010 WL 8400118, at *1; *Lehman v. Goldin*, 36 So. 2d 259, 260 (Fla. 1948) (quoting Rest. Torts §§ 624-26)); *Old Plantation Corp. v. Maule Indus., Inc.*, 68 So. 2d 180, 182 (Fla. 1953); *Gates v. Utsey*, 177 So. 2d 486, 487 (Fla. 1st DCA 1965).

protected property interest capable of being transferred or sold can be subject to disparagement. *Gates*, 177 So. 2d at 488–89.

As already shown, Baldiri recklessly accused De Iraola of not being associated with Five Live in a press release dated January 3, 2011, and he overtly sought to induce local Argentine producers to participate in the smear campaign against Plaintiffs and publish yet another slanderous press release about De Iraola. Ex. 3 at 212:19–21, 213:23–215:17, 227:2–24, 228:18–229:17, 230:20–231:17; Ex. 31. Baldiri either knew or should have known that such slanderous statements were "incompatible with the proper exercise of his lawful business," *Hoch*, 742 So. 2d at 457, and would have serious consequences on De Iraola's business. In fact, as a result of Defendants' statement, various businesses and individuals who had previously transacted with Plaintiffs stopped all contact with them. Ex. 2 at 46:6–12, 218:1–219:7.

In light of such reckless disregard for Plaintiffs' livelihood and the truth, lost opportunities and pecuniary damages, including attorneys' fees and costs, are recoverable in the case at bar. *See, e.g.*, *Bothmann*, 458 So. 2d at 1170 (citing Rest. 2d Torts § 633 (1977)); *Glusman v. Lieberman*, 285 So. 2d 29, 31–32 (Fla. 4th DCA 1973). Moreover, punitive damages are also recoverable because Defendants acted with a "gross indifference to or reckless disregard of the rights of others as will amount to a willful or wanton act." *Bothmann*, 458 So. 2d at 1170 (citing *Collier County Publ'g Co. v. Chapman*, 318 So. 2d 492, 495 (Fla. 2d DCA 1975)).

## VII.   Defendants' Ongoing Practice of Abusive Conduct Resulting in the Forfeiture of Sums Deposited by Producers Presents a Clear Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")

The stated purpose of the FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2) (2006). The "FDUTPA applies to private causes of action arising from single unfair or deceptive acts in the conduct of any trade or commerce, even if it involves only a single party, a single transaction, or a single contract." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). A plaintiff setting forth a claim under the FDUTPA must prove: (a) a deceptive act or unfair practice; (b) causation; and (c) actual damages.[17]

---

[17]     *CareerFairs.com v. United Bus. Media LLC*, 838 F. Supp. 2d 1316, 1324 (S.D. Fla. 2011); *Nationwide Mut. Co. v. Ft. Myers Total* Rehab *Ctr.*, 657 F. Supp. 2d 1279, 1290 (M.D. Fla. 2009) (quoting *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008)).

Section 501.204(1) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." An "unfair practice" is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *PNR, Inc.*, 842 So. 2d at 777 (quoting *Samuels v. King Motors Co. of Fort Lauderdale*, 782 So. 2d 489, 499 (Fla. 4th DCA 2001)). "Deception" occurs if there is a "representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *N. Am. Clearing, Inc. v. Brokerage Comp. Servs., Inc.*, 666 F. Supp. 2d at 1299, 1311 (M.D. Fla. 2009). Unfair or deceptive conduct underlying a breach of contract claim is actionable under the FDUTPA. *See id.* at 1310.

Here, Defendants have engaged in an oppressive, unfair, and deceptive practice whereby they cancelled concerts and pocketed all deposits made by producers simply because Daddy Yankee "love[s] making money." Ex. 5 at 63:12–22 (stating that there have been "[a] lot" of cancellations "because . . . promoters have not complied with the contracts"), 69:25–70:9, 71:7–13. Defendants have used this predatory practice in at least Guatemala (Ex. 4 at 48:22–50:8), Orlando and Miami (Ex. 4 at 52:10–54:4), Peru in 2009 (Ex. 4 at 55:2–9; Ex. 28 at 180:21–181:19, 188:22–189:13), Chicago (Ex. 4 at 59:4–9), and Venezuela (Ex. 29 at 22:22–23:22, 29:2–20). *See generally* Ex. 3 at 184:4–20, 186:24–189:3, 190:6–19, 193:9–14. Defendants *never* return deposits to producers after cancelling contracts, no matter the circumstances or amounts already deposited. *See* Ex. 3 at 199:8–16; Ex. 4 at 54:5–15; Ex. 28 at 185:13–186:20, 189:17–190:1; Ex. 29 at 31:23–32:1 ("We never return money.").

In conformity with this practice, Defendants unilaterally changed the terms pursuant to which Daddy Yankee was to perform, and repeatedly threatened to cancel the 2010 tour absent full payment of both contracts before the artist arrived in Argentina. *See, e.g.*, Ex. 26; Ex. 27. They did so despite Baldiri's promises to De Iraola that the contract payment schedule would not be followed. Ex. 2 at 64:21-65:13. Subsequently, Plaintiffs met additional pressure to conform to Defendants' demands when local businessmen and producers feared that Baldiri and Daddy Yankee would not perform. *See* Ex. 2 at 93:18-94:12, 96:24-97:4.[18]

---

[18]  Defendants continued their abusive and predatory practices even after cancelling the 2010 tour. Baldiri and Mireddys irrationally refused to reschedule at least some concerts with local Argentine businessmen unrelated to the Parties' contracts unless the latter paid approximately $375,000—*without signing a contract*—which Defendants considered to be half of the fees and costs associated with the 2010 tour cancellation. Ex. 3 at 227:2–24, 228:18–230:25, 238:3–7;

*Five Live Entertainment, et al. v. Ramon Luis Ayala Rodriguez, et al.*
Case No. 11–CV–24142 Seitz/Simonton

Pursuant to their abusive pattern of conduct, Defendants engaged in a course of conduct that caused Plaintiffs to widely and publicly promote a concert tour and to engage vendors and producers for ten large-scale shows across Argentina that in fact never happened. Defendants further engaged in a public relations campaign against Plaintiffs by broadly disseminating false and defamatory statements. As a result, Plaintiffs are entitled to compensatory damages arising out of Defendants' breach of the parties' contracts, as well as attorneys' fees and court costs.

## VIII.   Defendants' Defamation Counterclaims Fail as a Matter of Law

The statements at issue in Counts IV and V of Defendants' defamation counterclaims are not actionable because they are either true or opinion.[19]

De Iraola made the following statements in an email, dated December 27, 2010 ("December 27 Email"): (a) the statements in the Press Release were false and published to harm Plaintiffs' reputations; (b) De Iraola and others made various payments to Daddy Yankee through Icaro, all of which they kept; (c) Defendants never sent Plaintiffs a *formal* document explaining why they cancelled the 2010 Tour; (d) Daddy Yankee and Icaro attempted to start a "media war" with Plaintiffs without legal justification; and (e) Defendants face criminal charges in Argentina. Ex. 40; 56.1 Statement ¶ 36; *see also* Counterclaims ¶ 29.[20]

*First*, statements (a) through (c) are true, as discussed above. (A) Plaintiffs accurately stated that Defendants' Press Release made false allegations. As shown above, at all relevant times De Iraola indisputably had ample powers to act on behalf of Five Live. Further, contrary to Defendants' Press Release, De Iraola never forged Baldiri's signature on a single contract.

---

Ex. 4 at 112:7–113:9; Ex. 28 at 152:9–156:11, 167:15–168:22. Defendants also required as a condition of any contract that the local producers publish a press release slandering De Iraola. Ex. 4 at 113:12–115:5. The local businessmen refused, and no contract was ever executed. Ex. 4 at 117:25–118:17, 119:9–120:8; Ex. 3 at 230:20–231:17, 233:12–234:19, 245:14–19.

[19]   *See, e.g.*, *Cape Publ'ns, Inc. v. Reakes*, 840 So. 2d 277, 279-80 (Fla. 5th DCA 2003) ("[I]f the statements are true, the required element of false statement is not present."); *Razner v. Wellington Reg'l Med. Ctr., Inc.*, 837 So. 2d 437, 442 (Fla. 4th DCA 2002) (affirming summary judgment dismissing defamation claim where statements "were not actionable because they were either true or opinion"); *Linafelt v. Beverly Enters.-Fla., Inc.*, 745 So. 2d 386, 389 (Fla. 1st DCA 1999) (holding "claim for defamation must fail" because "the statement was true").

[20]   Defendants' Counterclaims mischaracterize the December Press Release as stating that "Daddy Yankee and Icaro were to blame for the cancellation of the Argentine tour." ¶ 29. The December 27 Email merely states that De Iraola was surprised to see the false statements in Defendants' Press Release. *See* Ex. 40.

*Five Live Entertainment, et al. v. Ramon Luis Ayala Rodriguez, et al.*
Case No. 11–CV–24142 Seitz/Simonton

Because Defendants' statements are slander *per se*, it is assumed that they published these statements with an intent to harm Plaintiffs' reputations.  *Supra* Part IV.[21]   (B) Plaintiffs accurately stated, and it is undisputed, that Defendants have *retained* all of Plaintiffs' payments to them.  Ex. 7; Ex. 2 at 103:5-17; Answer ¶ 28; 56.1 Statement ¶ 14.   (C) Plaintiffs also accurately stated that Defendants never sent Plaintiffs a "formal" document (*e.g.*, a formal letter) explaining the reasons for the cancellation of the tour.  Ex. 9 ¶ 29.  Defendants sent only e-mails threatening to cancel, and eventually cancelling, the 2010 Tour.  *Id.*; Ex. 19; Exs. 20-21; Ex. 25; Ex. 27.

*Second*, statement (d)—that Defendants are starting a "media war"—is not actionable. First, the evidence suggests it is true.  In fact, Baldiri approached two Argentine producers in Miami to plan yet an additional press release to further slander De Iraola's character.  Ex. 3 at 227:2–24, 228:18– 229:17, 230:20–231:17; Ex. 4 at 117:25–118:17.  At a minimum, the statement is one of opinion and is therefore protected speech.  *Cf. Weight-Rite Gold Corp. v. U.S. Golf Ass'n*, 766 F. Supp. 1104, 1111 (S.D. Fla. 1991) (pure opinion statements are not actionable).   "A statement is pure opinion, as a matter of law, when it is based on facts which are otherwise known or available to the reader or listener."  *Razner*, 837 So. 2d at 442.  Defendants had already published the Press Release and made several defamatory statements about Plaintiffs in public interviews *before* December 27, 2010.  *See supra* Parts IV-VI.  Thus, the statement was based entirely on facts already "known or available to the reader or listener" at the time of publication and, as such, constitutes opinion as a matter of law.  *Razner*, 837 So. 2d at 442.

*And finally*, statement (e)—the pendency of criminal charges—was true at the time of publication (December 14, 2010).  Defendants indisputably faced a criminal complaint in Argentina.  Ex. 9 ¶ 33.  Indeed, Defendants have *always known* that they faced at least one criminal action in Argentina, as evidenced by the multiple contemporaneous news articles stating so—all of which *they themselves produced to Plaintiffs*.  56.1 Statement ¶ 35; Exs. 38-39.  Thus, Defendants' defamation counterclaims fail as a matter of law because the statements in the December 27 email are indisputably either true or opinion.  *See Razner*, 837 So. 2d at 442.

---

[21]      De Iraola's statement that Defendants published their Press Release with the intention of harming Plaintiffs' reputations is not actionable for the independent and sufficient reason that it constitutes protected opinion.  *See From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 56 (Fla. 1st DCA 1981) ("Under the First Amendment there is no such thing as a false idea.").

*Five Live Entertainment, et al. v. Ramon Luis Ayala Rodriguez, et al.*
Case No. 11–CV–24142 Seitz/Simonton

IX.   **Defendants' Breach of Engagement Contract Counterclaim Fails As A Matter of Law**

As discussed above, Plaintiffs performed all of their duties under the Engagement Contract.  *First*, there is no dispute that Plaintiffs did all work necessary to produce the concerts. *See* discussion *supra* pages 3-4.

*Second*, Plaintiffs in fact procured all necessary visas and travel documents, *supra* pages 3-4, *despite* Defendants' unreasonable policy of preventing Plaintiffs from accessing all necessary travel information until merely *days* before the first scheduled concert. Ex. 2 at 72:10-15, 76:16-77:1, 154:1-19; Ex. 4 at 70:14-19, 71:6-13; Ex. 27.

*And finally*, Plaintiffs paid the entirety of the Engagement Contract, $800,000 in cash and approximately $20,000 in in-kind contributions.  *See* discussion *supra* at 4.  Defendants accepted and retained each of these payments.  *Id.*  Therefore, Defendants failed to assert a viable counterclaim for breach of the Engagement Contract (*see* Counterclaim ¶ 29).

X.   **Defendants' Breach of Second Contract Counterclaim Fails As A Matter Of Law**

Defendants' counterclaim—that Plaintiffs breached the Second Contract by failing to obtain work permits and visas and to pay the full price of the Second Contract (Counterclaim ¶ 45)—lacks merit.

*First*, there is no dispute that Plaintiffs did all the necessary work to produce the concerts. *See* discussion *supra* pages 3-4, 6.  *Second*, as addressed above, Plaintiffs *did* obtain all work visas and necessary travel documents despite Defendants' dilatory tactics.  *Supra* page 4.

*And finally*, the undisputed evidence shows that Plaintiffs were willing and able to pay, but were **prevented from doing so by Defendants**.  *See A.H.A. Gen. Const., Inc.*, 92 N.Y.2d at 30) (quoting *Kooleraire Serv. & Installation Corp.*, 28 N.Y.2d at 106) (a party preventing other contracting party from compliance cannot complain because of lack of compliance).   As discussed above, Plaintiffs presented several proposals for delivering full payment of the Second Contract to Defendants, yet, without explanation, Defendants refused *all of them* and unilaterally cancelled the *entire* 2010 Tour based simply on their own refusal to accept payment.  *See* discussion *supra* at 6-8.  Defendants cannot now "take advantage of a condition precedent, the performance of which [they themselves have] rendered impossible." *Koolaire Serv. & Installation Corp.*, 28 N.Y.2d at 108; *Greenspan v. Amsterdam*, 145 A.D.2d 535, 536 (2d Dep't 1988).

*Five Live Entertainment, et al. v. Ramon Luis Ayala Rodriguez, et al.*
Case No. 11–CV–24142 Seitz/Simonton

**XI.**   **Defendants' Promissory Estoppel Counterclaim Fails as a Matter of Law**

The elements of promissory estoppel are "(1) a promise made by the promisor; (2) 'which the promisor should reasonably expect to induce action or forbearance on the part of the promisee,' (3) that in fact induced such action or forbearance, and that (4) 'injustice can be avoided only by enforcement of the promise.'"  *Mangravite v. Univ. of Miami*, 838 F. Supp. 2d 1326, 1333 (S.D. Fla. 2011) (quoting *White Holding Co. v. Martin Marietta Materials, Inc.*, 423 Fed. App'x 943, 947 (11th Cir. 2011)).  Promissory estoppel is "an extraordinary remedy" that must be established by clear and convincing evidence.  *Fried v. Stiefel Labs., Inc.*, No. 11-CV-20853, 2012 WL 4364300, at *10 (S.D. Fla. June 8, 2012); *W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 925 (Fla. 1989).

As discussed in Plaintiffs' Reply in Support of their Motion to Dismiss [Docket No. 134], promissory estoppel is unavailable "when there is an express contract between the parties."[22] Here, Defendants ***admitted*** in their Responses to Plaintiffs' Request for Admissions that the Engagement Contract is valid and binding on the parties, Ex. 12 ¶ 11; Ex. 13 ¶ 13; Ex. 14 ¶ 13; Ex. 15 ¶ 11, and all operative and relevant facts establishing that the parties presumably entered into the Second Contract.  *See* Ans. ¶¶ 16-20; *see also* Ninth Affirmative Defense ("[D]efendants are not denying that an express contract exists.").  Their admissions are "conclusively binding" and "conclusively establish" the facts admitted.[23]  In light of the parties' express agreements, Defendants' promissory estoppel counterclaim fails as a matter of law.

Defendants' promissory estoppel counterclaim fails for the additional reason that the record is devoid of any other concerts or business opportunities that Defendants could have pursued in the absence of the 2010 Tour.  The mere fact that they allegedly refrained from booking "Daddy Yankee for shows elsewhere during any of the scheduled concert dates," Counterclaims ¶ 52, is insufficient—Defendants have not produced any evidence that such other opportunities *actually* existed, "and such failure is fatal to their detrimental reliance claim."  *See Great Am. Assur. Co. v. Sanchuk, LLC*, No. , 2012 WL 5306354, at *10 (M.D. Fla. Oct. 26,

---

[22]    *JI-EE Indus. Co. v. Paragon Metals, Inc.*, No. 09-81590-CIV, 2010 WL 1141103, at *1 (S.D. Fla. Mar. 23, 2010) (citations omitted); *see also Moynet v. Courtois*, 8 So. 3d 377, 379 (Fla. 3d DCA 2009).

[23]    *See* Fed. R. Civ. P. 36(b); *Zurich Am. Ins. v. Frankel Enters.*, 287 Fed. App'x 775, 778-79 (11th Cir. 2008); *In re Gosman*, 382 B.R. 826, 843 (Bankr. S.D. Fla. 2007) (quoting *Raiford v. Abney*, 695 F.2d 521, 523 (11th Cir. 1983)).

2012) (quoting *State Farm Fire & Cas. Ins. Co. v. Ortiz*, 560 So. 2d 1350, 1351 (Fla. 3d DCA 1990) (finding no detrimental reliance where claimants did not offer evidence that they could have, or even would have, secured other opportunities)).

**XII.** **Most of Defendants' Affirmative Defenses ("Defenses") Fail as a Matter of Law**

**A.** **Contract Defenses**

The First, Second, and Sixth Defenses fail because Plaintiffs paid the full amount due under the Engagement Contract and obtained all necessary travel and visa documents under both agreements.  *See* section II *supra*.  Likewise, the Fifth Defense fails because Defendants prevented Plaintiffs from paying any remaining amounts due.  *See* section III.B *supra*.

The Third and Seventh Defenses are frivolous and not well taken.  Defendants *admit* that the Engagement Contract is valid and binding on the parties, Ex. 12 ¶ 11; Ex. 13 ¶ 13; Ex. 14 ¶ 13; Ex. 15 ¶ 11, and that Defendants previously worked with Five Live, through De Iraola, in 2009.  56.1 Statement ¶¶ 7-8; Ans. ¶¶ 17-19.  Their binding admissions, coupled with Plaintiffs' affirmative evidence, independently show that De Iraola had the authority to bind Five Live to the Engagement and Second Contracts. 56.1 Statement ¶ 1, Ex. 1.

The Eighth Defense improperly suggests that the Second Contract is not an oral agreement, even though the agreement was not drafted until *four days* before the tour was scheduled to begin and De Iraola never received a signed copy of the agreement.  56.1 Statement ¶ 17, 19-20; Ex. 13 ¶ 28.  As an oral agreement, the Second Contact is not subject to the parol evidence rule.[24]  But even if the parol evidence rule applied—which it does not—the Eighth Defense would still fail because Defendants prevented Plaintiffs' performance under the Second Contract.  *See* section III.B *supra*.

The Twentieth to Twenty-fifth Defenses lack *any* factual support.  The evidence is instead to the contrary.  De Iraola had available all amounts due to Defendants and was able and willing to pay them, but, as discussed, Defendants prevented him from doing so.  56.1 Statement ¶¶ 23-24; Ex. 2 195:24-198:2; *see* section III.B *supra*.

---

[24]  *See, e.g.*, *U.S. v. Wallace & Wallace Fuel Oil Co.*, 540 F. Supp. 419, 425 (S.D.N.Y. 1982) ("This rule was developed to safeguard the sanctity of integrated *writings* from future attempts at contradiction.") (emphasis added) (citations omitted).

*Five Live Entertainment, et al. v. Ramon Luis Ayala Rodriguez, et al.*
Case No. 11–CV–24142 Seitz/Simonton

### B.   Defamation Defenses

The Eleventh Defense fails because the record shows that Defendants did make several defamatory and false statements about Plaintiffs.  *See* section IV *supra*.

The Twelfth Defense fails because Defendants' statements are not opinion.  A statement is pure "opinion" as a matter of law when it is "based on facts which are otherwise known or available to the reader or listener."  *Razner v. Wellington Reg'l Med. Ctr., Inc.*, 837 So. 2d 437, 442-43 (Fla. 4th DCA 2002).  It is indisputable that none of the statements at issue were known to the public before Defendants published the Press Release.  *See* section IV *supra*.  Moreover, accusations of criminal activity are *never* protected.  *See Hay v. Independent Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. 2d DCA 1984) (citing *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369 (1977)).  Defendants' statements that De Iraola "swindled" Daddy Yankee, pocketed money, and forged Baldiri's signature are criminal accusations that cannot be privileged.  *See* section IV *supra*; *see also* 56.1 Statement ¶ 28.

The Thirteenth Defense fails for similar reasons.  As an initial matter, statements of mixed opinion are actionable and *not* protected under the First Amendment.  *See Hay*, 450 So. 2d at 295.  A statement of mixed opinion "is based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication.  Rather, the communicator implies that a concealed or undisclosed set of defamatory facts would confirm his opinion."  *Id.*  "The facts upon which the opinion is based must be stated and disclosed or known to the audience to whom the publication is made not to be actionable."  *Scott v. Bush*, 907 So. 2d 662, 668 (Fla. 5th DCA 2005).

Here, there is no evidence that Defendants ever disclosed the contents or facts underlying any alleged opinions.  Indeed, they cannot do so because it is clear from the publications themselves that Defendants did not assume a set of facts.  *See* 56.1 Statement ¶¶ 27-29; Ex. 30.

The Fourteenth Defense fails because there is no mutual interest between Defendants and the media or fans.  An otherwise defamatory statement is privileged only if the following elements are established:  "(1) good faith; (2) an interest in the subject by the speaker or a subject in which the speaker has a duty to speak; (3) a corresponding interest or duty in the listener or reader; (4) a proper occasion; and (5) publication in a proper manner."  *Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1264 (S.D. Fla. 2004); *see also Scholz v. RDV Sports, Inc.*, 710 So. 2d 618, 626 (Fla. 5th DCA 1998) (citing Rest. (2d) Torts § 596 (1977)).

The *Scholz* court found that a sports team, which made defamatory statements about its former coach, "had no common interest with those members of the media to whom the allegedly defamatory statements were made." *See id.* Here, Defendants similarly claim that Daddy Yankee fans and local producers share an interest with Defendants as a means of justifying the Press Release and other defamatory statements made about De Iraola. *See* Fourteenth Aff. Def. The relation of fans and producers—with whom the artist *did not work*—to artists or performers is unlike any envisioned under section 596 of the Restatement. *See Scholz*, 710 So. 2d at 626 n. 4 (citing Rest. (2d) Torts § 596 (1977) (listing members of charitable organizations, corporations, co-workers, co-owners of property, and the like)). Defendants cannot claim a qualified privilege.

The Fifteenth Defense likewise fails because Defendants are neither neutral nor disinterested. Florida recognizes three types of privilege: (1) mutuality of interest; (2) statements made to employers regarding job and employment performance; and (3) expressions of fair comment and criticism. *Falic*, 347 F. Supp. 2d at 1264 (citing *Nodar v. Galbreath*, 462 So. 2d 803, 809-10 (Fla. 1984)). The third type of privilege applies when the statement is published by an entity who gives a "fair and accurate account of the remarks." *See, e.g.*, *Abram v. Odham*, 89 So. 2d 334, 336 (Fla. 1956); *see also Ortega Trujillo v. Banco Central Del Ecuador*, 17 F. Supp. 2d 1334, 1338 (S.D. Fla. 1998).

*First*, the matter at issue—a breach of contract action between two private entities—is not of public concern or "newsworthy," and so cannot be subject to the fair comment and criticism privilege. *See Ortega Trujillo*, 17 F. Supp. 2d at 1338 n. 3 ("There is 'no qualified privilege to defame a private individual simply by value of the matter being of public concern,' even for the media.") (quoting *Ortega v. Post-Newsweek Stations*, 510 So. 2d 972, 975 (Fla. 3d DCA 1987)). *Second*, the statements at issue came almost exclusively from Icaro and Baldiri, acting as agents of Daddy Yankee and El Cartel. As such, Icaro's statements cannot be privileged because it acted as a public relations agency on behalf of Defendants and was in no way "disinterested []or neutral insofar as events relating" to this litigation. *See Ortega Trujillo*, 17 F. Supp. 2d at 1338 (finding no privilege where biased firm published libelous press release). *And finally*, a comment or criticism *cannot* be fair if it is based on misstatements of facts. *See, e.g.*, *Miami Herald Pub. Co. v. Brautigam*, 127 So. 2d 718, 723 (Fla. 3d DCA 1961). Here, the record shows that the statements at issue are false. *See* section IV *supra*.

*Five Live Entertainment, et al. v. Ramon Luis Ayala Rodriguez, et al.*
**Case No. 11–CV–24142 Seitz/Simonton**

### C.       <u>Civil Conspiracy to Defame Defenses</u>

The Thirty-Second to Thirty-Sixth Defenses must be dismissed for the same reasons discussed above, sections V and XII.B *supra*.

### D.       <u>Injurious Falsehood Defenses</u>

The Sixteenth to Nineteenth Defenses must be dismissed for the same reasons discussed above, sections VI and XII.B *supra*.

### E.       <u>Other Defenses Fail or Were Withdrawn</u>

The Twenty-Sixth Defense fails because the record indicates that Plaintiffs were unable to work under the Five Live name as a result of Defendants' actions.  *See* 56.1 Statement ¶¶ 30-31; Ex. 2 at 46:6-12, 218:1-219:7, 220:2-8, 217:19-25, 47:2-19, 48:2-11, 51:1-6, 51:18-25, 85:1-87:24.

Last, it should be noted that Defendants voluntarily withdrew the Twenty-Ninth and Thirtieth Defenses [Docket No. 112].

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the Motion in its entirety, together with such other and further relief as the Court may deem just and proper.


Dated:     April 26, 2013


                              Respectfully submitted,

                    By:     /s/Daniel E. Vielleville
                            Peter E. Berlowe (FBN 143650)
                            Daniel E. Vielleville (FBN 940496)

                            *Attorneys for Plaintiffs Five for Entertainment, S.A.,
                            d/b/a Five Live Entertainment, and Diego Hernán
                            de Iraola*

*Five Live Entertainment, et al. v. Ramon Luis Ayala Rodriguez, et al.*
Case No. 11–CV–24142 Seitz/Simonton

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 26, 2013, a true and correct copy of the foregoing was served to the parties listed below in the manner so stated.

## SERVICE LIST

**Via CM/ECF**

POLENBERG COOPER PA
Jon Polenberg, Esq.
jpolenberg@polenbergcooper.com
Jude Christopher Cooper, Esq.
jcooper@polenbergcooper.com
1351 Sawgrass Corporate Parkway
Suite 101
Fort Lauderdale, FL 33323
Telephone: 954-742-9995
Facsimile: 742-9971
*Attorneys for Defendants*

PRADO NUNEZ & ASSOCIATES
Edwin Prado, Esq. (*pro hac vice*)
Del Parque St. 403, 8th Floor
San Juan, PR 00912
Telephone:  (787) 977-1411
*Attorneys for Defendants*

POLENBERG COOPER PA
Barbara Riesberg, Esq.
briesberg@polenbergcooper.com
Morgan P. Theodore, Esq.
theodore@polenbergcooper.com
777 Brickell Avenue, Suite 1210
Miami, FL 33131
Telephone: (305) 371-9617
Facsimile: (305) 371-9628
*Attorneys for Defendants*

By:     /s/ Daniel E. Vielleville
        Daniel E. Vielleville, Esq.