UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 11-24142-CIV-SEITZ/SIMONTON

FIVE FOR ENTERTAINMENT S.A., *et al.*,

           Plaintiffs,
vs.

RAMON LUIS AYALA RODRIGUEZ, *et al.*,

           Defendants.
_____/

## ORDER GRANTING IN PART SUMMARY JUDGMENT ON THE CONTRACT CLAIMS

This matter is before the Court on Defendants' Motion for Summary Judgment [DE-136] and Plaintiffs' Motion for Summary Judgment [DE-137]. This case arises from a failed series of concerts in Argentina involving Daddy Yankee, a multiple Grammy award-winning singer of Reggaeton music. Plaintiffs' First Amended Complaint [DE-35] alleges two claims for breach of contract and claims for unjust enrichment, quantum meruit, defamation, injurious falsehood, violation of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), and civil conspiracy to defame. Defendants filed an Answer, thirty-six affirmative defenses, and a counterclaim [DE-19]. The counterclaim alleges two counts of breach of contract, and counts for promissory estoppel, defamation, and defamation per se. Both sides have moved for summary judgment.

This order addresses only the parties' breach of contract claims and Plaintiffs' unjust enrichment and quantum meruit claims. Because valid contracts exist the unjust enrichment and quantum meruit claims are dismissed. Because Plaintiffs failed to make timely payment under the Engagement Contract, Plaintiffs breached that contract. Finally, because a genuine issue of material fact exists as to the payment due date under the Second Contract, summary judgment is

denied as to the breach of the Second Contract claims.

## I.     UNDISPUTED MATERIAL FACTS[1]

*The Parties*

Plaintiff Five for Entertainment S.A. d/b/a Five Live Entertainment (Five Live) is a Argentine Corporation with its principal place of business in Argentina. Five Live is in the business of producing music concerts, sporting events, and promotional activities. Plaintiff Diego De Iraola (Iraola) is Argentine and allegedly acted on behalf of Five Live.

Defendant Ramon Luis Ayala Rodriguez, known as Daddy Yankee, is a singer of Raggaeton music. Defendant El Cartel Records, Inc. is a Puerto Rican corporation and is Daddy Yankee's record label company. Mireddys Gonzalez is the President of El Cartel and Daddy Yankee's wife. Defendant Icaro Services, Inc. (Icaro) is a Florida corporation and is a booking agent. As Daddy Yankee's booking agent, Icaro provided services to Daddy Yankee, including publicity, marketing, and organization of concerts and events. Defendant Edgar Baldiri Martinez is the president of Icaro.

*The Engagement Contract*

In May 2010, Baldiri and Iraola began discussing and planning a concert tour of Argentina by Daddy Yankee. (DE-135-1 & 135-2.) As a result, Iraola and Icaro, represented by Baldiri and on behalf of El Cartel, as agent for Daddy Yankee, entered into a contract for Daddy Yankee to perform six shows in Argentina (the Engagement Contract). (DE-135-3.) Under the

---

[1] Only the facts relevant to the breach of contract, unjust enrichment, and quantum meruit claims are set forth. The facts are from the parties' statements of Undisputed Material Facts, filed at DE-135, 138, 148, and 151. Citations to paragraphs within the statements of facts will be cited as DE-135 at ¶ –. Citations to exhibits attached to the statements of fact will be cited by their docket number, such as DE-135-4.

2

terms of the Engagement Contract, Daddy Yankee was to perform shows at various locations in Argentina on November 12, 13, 14, 17, 19, and 20, 2010. (*Id.*) The Engagement Contract required Iraola to pay a total of $820,000 in four installments. (*Id.*) The first payment was due upon execution of the contract, the next was due on July 30, 2010, the third was due on September 1, 2010, and the last payment was due on November 1, 2010. (*Id.*) According to the contract, payment was to be made via wire transfer. (*Id.*) The Engagement Contract also required Iraola to pay travel expenses for Daddy Yankee and his staff and to obtain work permits and visas for Daddy Yankee and his personnel. (*Id.*)

In May 2010, Baldiri sent an email to Iraola stating that Iraola could split up the payments and make them gradually. (DE-138-8.) Thus, despite the payment schedule set out in the Engagement Contract, Iraola made the following payments under the Engagement Contract:

| | |
|---|---|
| June 10, 2010 | $90,000 |
| July 21, 2010 | $98,645 |
| August 11, 2010 | $14,850 |
| August 24, 2010 | $30,000 |
| September 5, 2010 | $100,000 |
| September 29, 2010 | $90,000 |
| October 6, 2010 | $39,600 |

(DE-135-16; DE-138-7.) All of the payments were made via wire transfer, except for the September 5, 2010 payment which was made in cash when Iraola and Baldiri met in Colombia. Thus, as of October 6, 2010, Plaintiffs had made payments of $463,095. Several additional payments were made in October and November but it is not clear from the evidence submitted by

the parties to which contract those payments should be attributed.

*The Second Contract*

In September 2010, Daddy Yankee and part of his entourage came to Argentina for a promotional tour. During the tour, four additional shows were announced. At that time Baldiri and Iraola entered into an oral agreement that Iraola would produce the four additional shows. (Iraola Dep.[2] 129:3-11; 21-23.) The parties also agreed that Iraola would not pay for the four additional shows until Daddy Yankee arrived in Argentina. (*Id.* at 138:21-139:3; 159:15-21.) However, after the promotional tour, Baldiri told Iraola that he would have to pay some of the money for the new concerts ahead of time. (*Id.* at 161:21-162:6.) Iraola began making the arrangements for the additional shows. (*Id.* at 140:10-16.)

On November 1, 2010, Baldiri emailed Iraola a written contract covering the four additional concerts. (DE-138-18.) Iraola signed the contract and emailed it back to Baldiri on November 2, 2010. (*Id.*) The signed contract (the Second Contract), like the Engagement Contract, also required Iraola to pay travel expenses for Daddy Yankee and his staff and to obtain work permits and visas for Daddy Yankee and his personnel. (DE-135-9.) The Second Contract covered four concerts to take place on November 5, 10, 14, and 21, 2010. (*Id.*) Under the terms of the Second Contract, Iraola was to pay a total of $480,000 in four installments due on the date of execution, October 25, 2010, November 1, 2010, and November 12, 2010. (*Id.*) At the time Iraola executed and returned the contract to Baldiri, three of those payment dates had passed. However, prior to November 1, 2010, Iraola had already started making payments on the Second Contract. On October 21, 2010, Iraola paid $90,000 on the Second Contract and on October 28,

---

[2]Iraola Dep. refers to the deposition of Iraola filed at DE-138-2.

4

2012, Iraola made a $100,000 payment on the Second Contract. (DE-135-16; DE-138-7.) Both payments were made by wire transfer. By November 16, 2010, Iraola had paid a total of $796,895 on both contracts, including the payments set out above and several additional payments. (DE-138 at ¶11 and DE-148 at ¶11.)

*The Death of Nestor Kirchner*

Fate disrupted the start of the tour. In late October 2010, the former president of Argentina and husband of the then president, Nestor Kirchner, died. As a result, all of the concert dates on Daddy Yankee's Argentina tour had to be rescheduled. (DE-138-20.) On November 5, 2010, Icaro issued a press release setting forth the new dates. (*Id.*) The new schedule reset the concerts for November 19, 20, 21, 23, 25, 26, 27, and 28, 2010 and December 3 and 4, 2010. (*Id.*) This meant that Daddy Yankee needed to depart for Argentina no later than November 17, 2010.

*November 2010 Events*

On Tuesday, November 9, 2010, Baldiri sent Iraola an email stating that the "wire transfers of the balances for the various dates have to be sent no later than [Thursday,] November 11, 2010, so that they are reflected on Monday [November 15, 2010] . . . otherwise no one . . . will be able to get on the planes to travel to Argentina." (DE-138-21.) It could take up to five days for wire transfers from Argentina to be credited to Defendants' account. (DE-138-9 at ¶24, n.1.) Despite the November 9 email, no wire transfer was made. On Saturday, November 13, 2010, Iraola offered to send someone to Miami with a cashier's check, which would result in Baldiri receiving the money on November 16, 2010. (DE-138-27.) On the same day, Baldiri responded that "if the money isn't there before 4 p.m. Monday [November 15, 2010] . . . I'm

enforcing the contract for breach." (*Id.*)

Not having received payment by November 15, 2010, on Tuesday, November 16, 2010, Mireddys Gonzalez emailed Iraola and Baldiri stating that she had not yet received payment in full for all ten concerts and that she would have to cancel the concerts. (DE-138-29.) Two days after the November 15, 2010 deadline for payment, on Wednesday, November 17, 2010, at 4:57 p.m., two days before the first scheduled concert and the day that Daddy Yankee should have been traveling to Argentina, Iraola sent an email to Baldiri suggesting that Baldiri send a trusted employee to Argentina, as originally planned, and that when she arrived she could accompany Iraola to make the wire transfer and would be able to verify to Defendants that Iraola had made the transfer. (DE-138-28.) This payment option was also rejected. Defendants canceled the tour, issued a press release announcing the cancellation, and retained all monies previously paid by Iraola. (DE-135-27.) Defendants rely on Special Provision G of the contracts to justify retaining the money Plaintiffs paid.[3]

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come

---

[3]Special Provision G states:
If for any reason <u>attributable to Artist</u>, Artist does not perform the engagement set forth in this agreement, Artist shall refund to Purchaser, the total amount of compensation to Purchaser. If, however, the performance is unfeasible for reasons not attributable to Artist, Artist shall keep all amounts deposited.

forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (*quoting Anderson*, 477 U.S. at 251-52)).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

### III. DISCUSSION

#### A. The Breach of Contract Claims

Both sides allege that the other breached both the Engagement Contract and the Second Contract. Plaintiffs argue that Defendants breached both contracts by canceling the scheduled concerts and preventing Plaintiffs from complying with their contractual payment obligations. Defendants assert that Plaintiffs breached both contracts by failing to make payment in full when due. Because Plaintiffs failed to make final payment when due under the Engagement Contract, namely, prior to the Artist's scheduled travel to Argentina, Plaintiffs breached the Engagement

Contract. However, a genuine issue of material fact exists as to the payment requirements under the Second Contract and, therefore, both sides' motions for summary judgment based on the Second Contract are denied.

### i. Plaintiffs Breached the Engagement Contract by Failing to Timely Make Final Payment

Under the payment schedule set out in the Engagement Contract, Plaintiffs were to make the final payment on November 1, 2010. Plaintiffs first assert that they made payment in full under the Engagement Contract. While Plaintiffs did pay approximately $800,000 to Defendants, Plaintiffs' own November 9, 2010 email indicates that some of those payments were allotted to the Second Contract. Further, the Court notes that the full amount of the Engagement Contract was $820,000. While Plaintiffs assert that they were entitled to setoff certain expenses that they had incurred against the contract price,[4] the evidence Plaintiffs cite simply establishes that Baldiri had promised to cover the money when Daddy Yankee arrived in Argentina for the tour, not that Plaintiffs were entitled to setoff. *See* Iraola Dep. 103:5-17 (stating that Baldiri told Iraola that "when the artist could come to perform we would cover the money that I had unfairly had to pay for"); DE-138-9 at ¶29 (referring to spreadsheets of expenses). Plaintiffs also have not presented evidence establishing the amount of expenses that Plaintiffs incurred for which they were allegedly entitled to setoff against the contract amount.[5] Thus, contrary to Plaintiffs' assertions, Plaintiffs did not pay the Engagement Contract in full.

---

[4] Some of the expenses that Plaintiffs allege they were entitled to setoff against the contract price include the cost of cancelled flights. However, Plaintiffs have not pointed to any evidence clearly setting out the cost of these flights.

[5] While Plaintiffs have submitted spreadsheets of expenses, the spreadsheets are in Spanish and do not set out which expenses are reimbursable.

Plaintiffs also argue that Defendants waived the Engagement Contract's timing and form of payment provisions by accepting payments not in conformity with the schedule set out in the Engagement Contract. "Waiver, the intentional relinquishment of a known right, may be accomplished by express agreement or by such conduct or failure to act as to evince an intent to not to claim the purported advantage." *Hadden v. Consolidated Edison Co. of NY*, 382 N.E.2d 1136, 1138 (NY 1978) (citations omitted).[6] Plaintiffs have not established that Defendants intended to waive the right to payment in full prior to Daddy Yankee's departure for Argentina.

While neither side disputes that Defendants did not demand strict compliance with the payment schedule in the Engagement Contract, Plaintiffs have not presented any evidence to show that Defendants waived the right to final payment before Daddy Yankee left for Argentina. In fact, the evidence establishes otherwise. Iraola testified at his February 20, 2013 deposition that he knew from the time he entered into the Engagement Contract that full payment was due before Daddy Yankee "traveled to Argentina." (Iraola Dep. 102:20-103-4.) Furthermore, when asked in an earlier deposition session if Baldiri did anything to lead him to believe that he did not have to pay 100% of the Engagement Contract prior to Daddy Yankee leaving for Argentina, Iraola said no. (Iraola Dep. 65:14-20.) Prior to Daddy Yankee's scheduled departure, on November 9, 2010, Baldiri informed Iraola by email that payment in full was due by November 11, 2010. Defendants extended the due date until November 15, 2010, a date prior to Daddy Yankee's departure for Argentina. Thus, Defendants appear to have consistently maintained that payment in full was due prior to Daddy Yankee's departure for Argentina. Consequently, Defendants did not waive their right to payment prior to Daddy Yankee's departure for

---

[6] Both contracts state that they are governed by New York law.

Argentina.

Finally, Plaintiffs argue that Defendants cannot assert that Plaintiffs breached the Engagement Contract when Defendants' actions prevented Plaintiffs from making final payment under the contract. However, the evidence indicates that Plaintiffs' attempts to make final payment would not have resulted in timely payment by the November 15, 2010 deadline. Neither of the options Plaintiffs offered Defendants would have resulted in payment of the balance due prior to November 15, 2010. Iraola's offer to send someone to Miami to deliver a cashier's check would have resulted in receipt of the check by November 16, 2010, at the earliest, which was one day after the deadline, and the check would not have cleared until after Daddy Yankee would have had to leave for Argentina. That offer also did not comply with the contract's requirement that the money be sent via wire transfer. Iraola's offer to have one of Defendants' employees accompany Iraola to an Argentine bank to witness the wire transfer also would have resulted in payment after the November 15 deadline. The suggestion was made on November 17, two days after the deadline, and, as Iraola stated in his Affidavit, the transfer could have taken up to five days to be completed. Thus, such a transfer would not have been timely. Consequently, contrary to Plaintiffs' assertions, Defendants did not prevent Plaintiffs from timely fulfilling Plaintiffs' payment obligations under the Engagement Contract. Accordingly, Plaintiffs breached the Engagement Contract by failing to make final payment when due and, thus, Defendants are entitled to summary judgment on the breach of the Engagement Contract claims.

    ***ii.* *A Genuine Issue of Material Fact Exists Regarding the Terms of Payment Under the Second Contract***

Neither party disputes that there is a written Second Contract and that the parties had a

second agreement. Plaintiffs, however, dispute that the terms of the written Second Contract are the actual terms of the parties' second agreement. Plaintiffs argue that the written Second Contract combined with oral agreements made in September during the promotional tour constitute the actual Second Contract. The language of the written Second Contract requires final payment to be made on or before November 12, 2010. Plaintiffs assert that the payment schedule in the written Second Contract was not enforceable because by the time the written Second Contract was sent to Plaintiffs for execution on November 1, 2010, all but one of the dates in the payment schedule had already passed. Thus, Plaintiffs argue that it did not breach the Second Contract because, after the rescheduling of the concert dates, the written Second Contract did not represent the actual terms of the parties' agreement.

According to Plaintiffs, and Defendants have not presented any evidence to the contrary, during the September promotional tour, when the parties decided to add the four additional concert dates, Baldiri agreed that Plaintiffs could pay for the four additional dates after Daddy Yankee was in Argentina. While Iraola testified that Baldiri changed his mind about full payment, they still agreed that final payment would be made after Daddy Yankee arrived in Argentina. The written Second Contract actually confirms this understanding because the first concert date in the Second Contract is scheduled for November 5, 2010, the second concert date is November 10, 2010, and final payment is due under the Second Contract on November 12, 2010. Consequently, the evidence supports Plaintiffs' contention that the parties had agreed that Daddy Yankee would not receive final payment under the Second Contract until after he arrived in Argentina.

Ultimately, all of the concerts had to be rescheduled because of the death of Nestor

11

Kirchner. The rescheduled concert dates were officially announced on November 5, 2010, with the first of the rescheduled concerts on November 19, 2010. As a result of rescheduling all of the concert dates, final payment under the terms of the written Second Contract became due before Daddy Yankee arrived in Argentina.[7]

Clearly, the rescheduling of the concerts constituted a modification of the written contracts, as both contracts included the concert dates in them. Thus, the issue is whether the modification of the concert dates also modified the final payment date under the Second Contract, given the parties' original intention that final payment would not be due until after Daddy Yankee arrived in Argentina. Here, the evidence supports Plaintiffs' contention that the parties initially intended for final payment on the Second Contract to be due after Daddy Yankee arrived in Argentina. There is no question that the concert schedule was modified, making final payment due before Daddy Yankee's arrival in Argentina. Thus, in order to fulfill the parties' original intentions, the payment schedule would have had to have been modified[8] when the concert schedule was modified. Given the clear intentions of the parties at the time the Second Contract was entered, the Court finds that a genuine issue of material fact exists as to whether the payment terms of the parties' second agreement were modified when the concert dates changed. Therefore, summary judgment is denied as to Plaintiffs' breach of the Second Contract claim and

---

[7]As set out above, final payment under the written Second Contract was due on November 12, 2010, after two of the concerts would have taken place under the original schedule.

[8]Defendants raise the parol evidence rule to argue that oral agreements cannot modify a subsequent written agreement. However, that is not what happened here. The modification would have occurred as a result of the change in the concert schedule, after the written agreement was executed.

Defendants' breach of the Second Contract counterclaim.

### C. The Equitable Claims

Defendants also move for summary judgment on Plaintiffs' claims for unjust enrichment and quantum meruit. Defendants argue that a party cannot assert a claim for unjust enrichment or quantum meruit when an enforceable contract exists that covers the same subject matter. Plaintiffs have not responded to this portion of Defendants' motion. Florida law is clear that quantum meruit damages cannot be awarded when an enforceable contract exists. *Cross v. Strader Construction Corp.*, 768 So. 2d 465, 466 (Fla. 2d DCA 2000); *Corn v. Greco*, 694 So. 2d 833, 834 (Fla. 2d DCA 1997). Nor can a party recover for unjust enrichment when an enforceable contract exists. *Browning v. Poirier*, 113 So. 2d 976, 980 (5th DCA 2013). As set out above, and as both parties argue, valid enforceable contracts exist between the parties. Therefore, Defendants are entitled to summary judgment on these claims and the claims must be dismissed.

Accordingly, it is

ORDERED that:

1. Defendants' Motion for Summary Judgment [DE-136] is GRANTED in part.

   a. Summary judgment is granted in favor of Defendants as to the breach of the Engagement Contract claims and the unjust enrichment and quantum meruit claims.

   b. Summary judgment is denied as to the breach of the Second Contract claims.

2. Plaintiffs' Motion for Summary Judgment [DE-137] is DENIED as to the breach of contract claims.

3.  The Court will enter a separate order on the remaining portions of the motions for summary judgment.

4.  The parties shall file their Joint Pretrial Stipulation by **August 26, 2013.**

5.  The Pretrial Conference set for August 23, 2013 is reset for **September 4, 2013 at 9:00 a.m.**

DONE and ORDERED in Miami, Florida, this 31st day of July, 2013.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:   All Counsel of Record