UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 11-24142-CIV-SEITZ/SIMONTON

FIVE FOR ENTERTAINMENT S.A., *et al.*,

              Plaintiffs,

vs.

RAMON LUIS AYALA RODRIGUEZ, *et al.*,

              Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART SUMMARY JUDGMENT ON NON-CONTRACT CLAIMS

        This matter is before the Court on Defendants' Motion for Summary Judgment [DE-136] and Plaintiffs' Motion for Summary Judgment [DE-137]. This case arises from a failed series of concerts in Argentina involving Daddy Yankee, a multiple Grammy award-winning singer of Reggaeton music. Plaintiffs' First Amended Complaint [DE-35] alleges two claims for breach of contract and claims for unjust enrichment, quantum meruit, defamation, injurious falsehood, violation of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), and civil conspiracy to defame. Defendants filed an Answer, thirty-six affirmative defenses, and a counterclaim [DE-19]. The counterclaim alleges two counts of breach of contract, and counts for promissory estoppel, defamation, and defamation per se. By prior Order, the Court has addressed the cross-motions for summary judgment on the contract claims and Defendants' motion for summary judgment on Plaintiffs' unjust enrichment and quantum meruit claims.

        This order addresses the remaining portions of the cross-motions for summary judgment – the cross-motions on Plaintiffs' defamation, injurious falsehood, and conspiracy to defame claims, as well as Plaintiffs' motion for summary judgment on Defendants' defamation

counterclaims, Defendants' Affirmative Defenses, and Defendants' promissory estoppel claim.
Because Plaintiffs have failed to establish an element of their defamation, conspiracy to defame,
and injurious falsehood claims, their motion is denied as to these claims.  Defendants' motion for
summary judgment on Plaintiffs' defamation and injurious falsehood claims is granted in part.
Plaintiffs' FDUTPA claim and Defendants' promissory estoppel claim are dismissed.  Because
some of the statements made by Plaintiffs are true, Plaintiffs' motion for summary judgment on
Defendants' defamation counterclaims is granted in part.  Finally, Plaintiffs' motion for summary
judgment as to many of Defendants' Affirmative Defenses is granted in part.

## I.      UNDISPUTED MATERIAL FACTS

*The Parties*

Plaintiff Five for Entertainment S.A. d/b/a Five Live Entertainment (Five Live) is in the
business of producing music concerts, sporting events, and promotional activities.  Plaintiff
Diego De Iraola (Iraola) allegedly acted on behalf of Five Live.  Defendant Ramon Luis Ayala
Rodriguez, known as Daddy Yankee, is a singer of Raggaeton music.  Defendant El Cartel
Records, Inc. (El Cartel) is Daddy Yankee's record label company.  Mireddys Gonzalez, who is
not a named party, is the President of El Cartel and Daddy Yankee's wife.  Defendant Icaro
Services, Inc. (Icaro) is Daddy Yankee's booking agent and, as such, Icaro provided services to
Daddy Yankee, including publicity, marketing, and organization of concerts and events.
Defendant Edgar Baldiri Martinez is the president of Icaro.

*Summary of Facts Leading to Cancellation of Daddy Yankee's Tour*[1]

In May 2010, Plaintiffs and Defendants entered into a contract for Daddy Yankee to perform six concerts in Argentina (the Engagement Contract). The Engagement Contract required Plaintiffs to make four installment payments for a total of $820,000, all of which had to be paid before Daddy Yankee traveled to Argentina for the concerts. In September 2010, the parties agreed to add four more concerts to the tour. On November 1, 2010, after Plaintiffs had begun planning the additional concerts and had made partial payment for them, Plaintiffs received a written contract regarding the four additional concerts (the Second Contract). That Second Contract required Plaintiffs to pay a total of $480,000. Both contracts also required Plaintiffs to make all of the travel arrangements and to obtain work visas for Daddy Yankee and his staff. Issues arose over payment on the contracts and Defendants cancelled the tour, just days before the first scheduled concert. As of the date of cancellation, Plaintiffs had made payments of $796,895 of the $1.3 million due under the two contracts.

In the Order Granting in Part Summary Judgment on the Contract Claims [DE-169], the Court found that Plaintiffs breached the Engagement Contract by failing to make timely final payment. The Court found that genuine issues of material fact existed regarding the payment terms of the Second Contract. The Court also dismissed Plaintiffs' claims for unjust enrichment and quantum meruit.

---

[1] In its Order Granting in Part Summary Judgment on the Contract Claims [DE-169], the Court set out in detail the facts relating to the formation and performance of the contracts. The Court incorporates those facts here and will just briefly summarize them.

*Introduction to the Defamation and Injurious Falsehood Claims*[2]

Both sides have moved for summary judgment on Plaintiffs' defamation and injurious

falsehood claims and Plaintiffs have moved for summary judgment on Defendants' defamation

counterclaims.  Specifically, Plaintiffs have moved for summary judgment on their defamation

claims against Defendants based on four specific statements.  According to Plaintiffs' record

citations, three of the statements were made in a November 26, 2010 web press release on a

website not controlled by Defendants and one was made in a web posting on January 3, 2011 on

a different website not controlled by Defendants.  *See* DE-138-34 showing website as

http://www.reggaetonea.com/artistas/daddy-yankee and DE-138-33 showing website as

http://www.sonicomusica.info.

Defendants have moved for summary judgment on Plaintiffs' defamation claims based on

nine specific statements.  The first two statements were made on November 17, 2010 as part of a

press release issued by Defendants.  *See* DE-35, Ex. 3.  The third and fourth statements are part

of the same November 26, 2010 web press release on which Plaintiffs base part of their motion.

*See* DE-35, Ex. 66, showing website as http://www.reggaetonea.com/artistas/daddy-yankee and

compare with DE-138-33 showing website as  http://www.reggaetonea.com/artistas/daddy-

yankee.  The fifth statement is based on three articles posted on third-party websites on

November 25, 2010 and November 26, 2010.  DE-35, Exs. 67-69.  The sixth statement is based

on a January 3, 2011 article posted on a third- party website.  DE-35, Ex. 70.  The seventh

statement is based on articles posted on multiple third-party websites, three of which are undated

---

[2]Throughout their motions, the parties treat the defamation and injurious falsehood claims
jointly.  Therefore, the Court will also address them jointly.

and six of which are dated January 3, 2011.  DE-35, Exs. 72-80.  The eighth statement is really

an allegation in the Amended Complaint and Plaintiffs cite to a November 24, 2010 email to

support it.  DE-35, Ex. 81.  Finally, the ninth statement is from a November 25, 2010 email sent

by Baldiri.  DE-35, Ex. 82.

Plaintiffs have also moved for summary judgment on Defendants' defamation

counterclaims, which are based on Plaintiffs' December 27, 2010 press release.  The contents of

the various statements are set forth in detail below.

*Defendants' Post-Cancellation Press Releases and Communications*[3]

On November 17, 2010, after cancelling the tour, Defendants posted a press release on

Daddy Yankee's website.  The November 17, 2010 press release stated

> For lack of full payment of the contract . . .
> DADDY YANKEE'S TOUR IN ARGENTINA HAS BEEN CANCELLED
>
> ICARO BOOKING SERVICES . . . has been unfortunately forced to CANCEL the tour .
> . . the producer and the person responsible for the concerts in Argentina, still owed over
> 40 per cent of the total payment for the shows.
> " . . . we made it easier for the executive to make the payments in different ways which
> favored his compliance with us.  However, these efforts were useless, since to date, one
> day before travelling [sic], there has been no compliance," confirmed Edgar Baldiri
> Martinez, president of Icaro Booking Services.
> . . . these decisions are completely beyond the artist, DADDY YANKEE . . .
> In this context, the responsibility as to the ticket office and advertising commitments must
> be solely assumed by the producer FIVE LIVE ENTERTAINMENT which, under the
> direction of MR. DIEGO DE IRAOLA, failed to satisfactorily fulfill the clauses
> established in the contracts . . .

(DE-135-27.)  The Defendants admit that each of the statements in their press release were made

---

[3]The record contains several copies of many of the press releases.  Often the translations
(from Spanish to English) vary between the different copies.  The differences are of style and
grammar, not content.  Where possible, the Court will quote and cite to a translation from the
non-moving party.

with their consent and approval.  (DE-138-14 at ¶31; DE-138-15 at ¶38; DE-138-16 at ¶46; DE-138-17 at ¶40.)

Following the cancellation, Baldiri was quoted on the internet about the cancellation.  On November 26, 2010, Baldiri was quoted as saying: "A delegation of producers from several Argentine provinces came to Miami to meet with me and I demonstrated to them that my signature on what they signed with Iraola was forged."  (DE-138-34.)  The same internet post also stated that Baldiri called to inform that Daddy Yankee "had been swindled by Diego Iraola" and that "Baldini reported that Iraola had pocketed US $516,955 from the sale of shows and advertising promotions, which amounted to 40% of the contract price."  (*Id.*)  On November 25 and 26, 2010, several third-party websites posted articles stating that Plaintiffs had failed to confirm plane tickets and work visas for Daddy Yankee and his staff.  (DE-35, Exs. 67-69.)

Later, on January 3, 2011, Baldiri was quoted as saying:

At that time, we notified the Argentine public that we were going to cancel Yankee's shows because Mr. Diego De Iraola signed two contracts with us and failed to make the payments. He now owes US$ 516,000 under those contracts (....) He (Diego De Iraola) knew that the artist wanted to have the payments before arriving in Argentina . . . This gentleman's position is that of someone who commits a crime and then tries to come out and say things that aren't true. I have the documents signed by Mr. De Iraola and have no problem showing them so that you can see how things really are . . . this person signed as belonging to Five Live Entertainment, and Five later informs me that he no longer belongs to the group.

(DE-138-33.)  Many of these statements were repeated multiple times in the media.  (DE-138-35 & 138-36.)  Also on January 3, 2011, a third-party website posted the following:

. . . the businessmen affected by the lack of responsibility of this FIVE LIVE ENTERTAINMENT representative have contacted us not only by phone and e-mail but they have also travelled [sic] to our offices in Miami and learned what was happening with the agreements signed with IRAOLA. We have all done our best to benefit the public in general that is not responsible for these cancellations and to benefit the

businessmen who were deceived by DIEGO DE IRAOLA shows arrangements.

In an attempt to provide some answers he has defamed DADDY YANKEE . . . .

(DE-35, Ex. 70.)  According to the webiste, these statements are part of a press release issued by

Daddy Yankee. (*Id.*)

In addition, Baldiri exchanged emails with some of the local producers in Argentina

about dealing with the press.  In a November 25, 2010 email, Baldiri wrote:

> We haven't been forceful enough with the press
> There haven't been good articles, nothing relevant, there's no written press, radio shows,
> let's do phoners, if you want I'll go out and say it and you guys say a part.
> But we really have to hit hard on this, without good press responding to the attacks our
> hands are tied
> Remember what we talked about here
> If you're scared give me the tools, send me the contracts, the wires you signed with Diego
> and I'll show them
> But boys we have to hit him hard.

(DE-138-38.)  In another email, dated November 30, Baldiri wrote, in part:

> I'll summarize for you what we talked about with Leandro, ;arcela [sic], Leo Figoly
>
> 1. I showed them that Diego was the one who swindled them, not us, with papers and
> wire transfers, so we did a press release letting everyone know the situation and clarifying
> that neither you nor the artist nor Icaro have any responsibility here.
>
> 2. We agreed that you guys were going to work on the money, to get it together to pay it
> and be able to do the tour in 2011, >Leo and Leandro even asked me to try to do 3 of the
> possible dates in December and we talked about doing b aires, cordoba and comodoro,
> I'm looking for dates in the calendar since I don't have anything free I'm trying to push
> back private clients for a second time that I've already pushed back once for the first
> rescheduling when the expresident [sic] of argentina [sic] died.
>
> 3. We're trying to get back some of the money from some Copa Airline tickets.
>
> 4. We never got the first class tickets for the artist and his staff . . .
>
> Go out to the media to tell who swindled you . . . and prove it.

(DE-138-39.)

*Plaintiffs' Post-Cancellation Press Releases and Communications*

During this time, Iraola was also issuing press releases and statements to the media. On November 21, 2010, an article appeared on the web, entitled *I made the payments but was scammed by Daddy Yankee*. (DE-135-34.) It stated, in part: "Diegi de Iraola, responsible for the shows in Argentina, came to Tucuman to 'show face'. 'I was scammed.' . . . was the statement of the producer Diego Hernan de Iraola." (*Id.*) On December 27, 2010, Iraola issued a press release stating:

> With an international arrest warrant, Daddy Yankee will have to appear before the Argentine Courts . . . In view of the false information reported so far by the artist DADDY YANKEE through the agency that represents him in different press releases and interviews, it is my duty to publish this brief press release.
> DADDY YANKEE and Icaro Services Inc. wanted from the beginning to wage a media war without any legal foundation, slandering me in order to justify their unjustifiable decision . . .
> . . . both [the local producers'] payments and mine are fully in the possession of MR. DADDY YANKEE; providing . . receipts for the payments sent to the account indicated by the artist belonging to the company ICARO SERVICES INC. (his official booking worldwide).
> I have to say that to date I have not received any effective communication from Mr. DADDY YANKEE or from the company Icaro Services Inc. explaining the reasons for the cancellation formally and as due considering such a significant CONTRACT between the parties.
> Both the fans and I only know what Icaro Services Inc. and DADDY YANKEE, for the sole purpose of continuing to damage me  published in Internet sites, based on unfounded allegations, something which, from the legal standpoint, is inconceivable. . . .

(DE-135-35.)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001).   Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'"   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* Fed. R. Civ. P. 56(e)).   The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"   *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (*quoting Anderson*, 477 U.S. at 251-52)).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial.   *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).   A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party.   *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## III.   DISCUSSION

### A.   Plaintiffs' Motion for Summary Judgment on their Defamation Claim and Injurious Falsehood Claim is Denied

Plaintiffs allege that Defendants defamed Plaintiffs in several press releases.   As a result Plaintiffs have alleged claims for defamation, injurious falsehood, and conspiracy to defame.

Both sides have moved for summary judgment on Plaintiffs' defamation claim. Plaintiffs' Motion for Summary Judgment lists four specific statements as the basis for Plaintiffs' claims: (1) Baldiri accused Iraola of forging Baldiri's signature on contracts with local promoters;[4] (2) Baldiri accused Iraola of stealing approximately $517,000; (3) Baldiri stated that Iraola "swindled" Daddy Yankee; and (4) Baldiri claimed that Iraola was not part of Five Live. Plaintiffs' record citations establishing the existence of these statements indicate that all of the statements were posted on third-party websites. Plaintiffs allege that they are entitled to summary judgment on their defamation claim based on each of these statements.

Under Florida law, in order to establish a cause of action for defamation, a plaintiff must show (1) publication; (2) falsity; (3) the actor acted with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement is defamatory. *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla.2008). As the moving parties, the burden is on Plaintiffs to establish each of these required elements. Because Plaintiffs have not clearly established that Baldiri, or any other Defendant, made the statements contained in the third-party web posts, Plaintiffs have not established that Defendants published the statements, a required element of their claim. Consequently, Plaintiffs' motion must be denied.

The first three statements that are the basis of Plaintiffs' motion were made in a November 26, 2010 web press release on a website not controlled by Defendants. *See* DE-138-

---

[4]The Court notes that Plaintiffs have mis-characterized this alleged statement. Baldiri never directly stated that Iraola forged his signature; instead, he stated "my signature on what they signed with Iraola was forged."

34. The last statement was posted January 3, 2011 on a website that also was not controlled by Defendants. *See* DE-138-33. Thus, neither of the postings were directly made by any of the Defendants. The first element that Plaintiffs must establish is that Defendants made the statements to a third party. Plaintiffs have not presented evidence establishing this element.

While Plaintiffs rely on the testimony of Andrea Ramirez, an employee of Icaro, in which she said that none of the articles distorted what Baldiri had said during interviews, DE-138-37 at 74:1-8, there is no evidence that she was talking about these four particular statements. A review of the transcript indicates that Ramirez was never asked about any of the specific statements that are the basis of Plaintiffs' motion and could not remember many of the statements allegedly made by Baldiri to the media. Ramirez testified as follows:

> Q. Do you recall reading any press article containing allegations that Mr. De Iraola may have stolen money?
>
> A. No.
>
> Q. Instead of stolen articles, alleging that he may have pocketed money from Daddy Yankee, or money that he owed to Daddy Yankee?
>
> * * *
>
> A. No.

DE-138-37 at 74:17-21. While Defendants admit making the statements contained in their own press releases, Defendants have not admitted making the four statements that are the subject of Plaintiffs' motion for summary judgment. Thus, Plaintiffs have failed to establish that Defendants published these statements.

A claim for injurious falsehood also requires proof of publication to a third party. *See Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 388 (Fla. 4th DCA

1999) (stating that publication or communication to third persons is an element of an injurious falsehood claim). Plaintiffs' motion also seeks summary judgment on their injurious falsehood claim based on statement 4, above. Because Plaintiffs have failed to establish that Defendants published the statement, Plaintiffs are not entitled to summary judgment on their injurious falsehood claim. Consequently, Plaintiffs' motion for summary judgment is denied on Plaintiffs' defamation and injurious falsehood claims.

### B. Defendants Motion for Summary Judgment on Plaintiffs' Defamation Claim and Injurious Falsehood Claim is Granted in Part and Denied in Part

Defendants also move for summary judgment on Plaintiffs' defamation and injurious falsehood claims. Defendants assert that the statements are true, they are statements of opinion, and Defendants had a qualified privilege to make them. Specifically, Defendants seek summary judgment on Plaintiffs' defamation and injurious falsehood claims as to nine statements allegedly made by Defendants:

1. "De Iraola, the producer who is responsible for the concerts in Argentina, still owes more than 40 percent of the total payment for the shows" [DE-35 Ex. 3]; "… Five Live [] under the direction of Mr. Diego De Iraola, failed to satisfactorily comply with the provisions of the contracts entered between him and Icaro Booking Services." [DE-35, Ex. 3.][5]

2. "The concerts have been planned for more than six months, which is why we gave the entrepreneur various payment options to help him honor his commitments to us. However these efforts were in vain because as of today, the day before our trip, he has failed to do so." [DE-35, Ex. 3.]

3. "A delegation of producers from several Argentine provinces came to Miami to meet with me and I demonstrated to them that my signature on what they signed with Iraola was forged." [DE-35, Ex. 66.]

---

[5]All of the citations included in these statement were used by Defendants in their motion. The citations are to the exhibits attached to Plaintiffs' Amended Complaint.

4. "Baldiri reported that Iraola had pocketed $516,955 from the sale of shows and advertising promotions, which amounted to 40% of the contract price." [DE-35, Ex. 66.]

5. Plaintiffs allege in the Amended Complaint: Five Live had "failed to confirm flight arrangements and work visas for Daddy Yankee's entourage." [DE-35, Exs. 67-69.]

6. "t[]he businessmen affected by the lack of responsibility of this FIVE LIVE ENTERTAINMENT representative have contacted us not only by phone and e-mail but they have also travelled [sic] to our offices in Miami and learned what was happening with the agreements signed with IRAOLA. We have all done our best to benefit the public in general that is not responsible for these cancellations and to benefit the businessmen who were deceived by DIEGO DE IRAOLA shows arrangements." [DE-35, Ex. 70.]

7. "This man signed [the documents] as being a part of Five Live Entertainment, but Five told me later that he was no longer in the group." [DE-35, Exs. 72-80.]

8. Plaintiffs allege in the Amended Complaint: "Baldiri told local producers, who had acquired rights to, or were otherwise involved in producing Daddy Yankee's performances that Plaintiff De Iraola had perpetrated a fraud on them… Baldiri encouraged and, in fact, caused the local producers to join him in disparaging Plaintiff De Iraola and Five Live under pretenses of future contracts with Daddy Yankee. Baldiri, other Icaro employees, and Ms. Gonzalez even worked with the local producers to draft press releases that the local producers could release to the media." Plaintiffs cite to DE-35, Ex. 81 in support of this allegation.

9. Plaintiffs allege: "Baldiri complained to some of those local businessmen that they had not been aggressive enough with Plaintiff De Iraola in the media and exhorted them to "hit [De Iraola] hard." [DE-35, Ex. 82.]

Defendants argue that all of these statements are true and, even if material issues of fact exist as to the truth of the statements, Defendants had a qualified privilege to make them. Defendants also argue that the statements are not actionable because they are pure opinion. As set out below, summary judgment is denied as to Statements 1, 2, 3, 4, 5, 6, and 7 and granted as to Statements 8 and 9.

      *i.*    *Defendants Have Not Established That They Are Entitled to a Qualified Privilege*

A qualified privilege exists when a communication is made in good faith on any subject matter by one having an interest therein if it is made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation. *Nodar v. Galbreath*, 462 So. 2d 803, 809 (Fla. 1984). A privilege would exist, for example, where communications were made for bona fide commercial purposes and the interest to be protected is the recipient's. *Id.* Here, Defendants argue that the statements were made to the local producers as part of a discussion of how to draft a press release about the cancellation of the tour. Plaintiffs argue that Defendants statements were not privileged because there was no mutuality of interest and the statements were made with express malice and, therefore, not in good faith.

In order to show express malice, and overcome any privilege, Plaintiffs must show that the statements were made with ill will or the desire to harm Plaintiffs. *See Lewis v. Evans*, 406 So. 2d 489, 493 (Fla. 2d DCA 1981). Plaintiffs point to one of the emails between Baldiri and several of the local producers in which Baldiri states that "we have to hit [Iraola] hard . . . But, guys we need to hit hard on this." DE-35-2 at 229. Based on these statements, there is a material issue of fact as to whether the allegedly defamatory statements were made in good faith.

Furthermore, in order to claim a qualified privilege, Defendants must establish that each of the statements individually was entitled to a privilege. Thus, Defendants must establish a mutuality of interest between them and each of the third-parties to whom each statement was made. Defendants' motion has not done a specific analysis for each of the statements; instead,

the motion makes broad generalizations.  As the moving parties, the burden is on Defendants to

establish the existence of a privilege as to each of the nine statements.  Defendants have not met

this burden.[6]  Consequently, Defendants are not entitled to summary judgment on the defamation

or injurious falsehood claims based on the existence of a qualified privilege to make the

statements.

       ii.      *Defendants Have Not Established That the Statements Are Pure Opinion*

Defendants also move for summary judgment on the defamation and injurious falsehood

claims because the statements are not actionable statements of opinion.   While Defendants

appear to be moving as to all of the statements, the motion only directly addresses three

statements.  Defendants argue that Baldiri's statements that: (1) Daddy Yankee "had been

swindled by Diego Iraola;"[7] (2) "We have all done our best to benefit the public in general that is

not responsible for these cancellations and to benefit the businessmen who were deceived by

DIEGO DE IRAOLA shows arrangements;" and (3) Iraola defamed Daddy Yankee[8] are all un-

actionable opinion.  Because the burden is on the party moving for summary judgment, the Court

will only address the three statements directly dealt with in Defendants' motion.

The difference between actionable statements and un-actionable opinion has been

explained as follows:

---

[6]The Court notes that unless Defendants present substantially more evidence at trial, they will not be able to establish a qualified privilege defense for any of the nine statements because they have not presented sufficient evidence to establish a mutuality of interest.

[7]This statement is part of the November 26, 2010 web post that contained Statements 3 and 4, above.

[8]This statement and the prior statement are both part of the January 3, 2011 web post that contained Statement 6, above.

> "[S]tatements of pure opinion cannot constitute actionable defamation." [*Stembridge v. Mintz*, 652 So. 2d 444, 446 (Fla. 3d DCA 1995)] (quoting *E. Air Lines, Inc. v. Gellert*, 438 So. 2d 923, 927 (Fla. 3d DCA 1983)). "Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public." *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981). On the other hand, actionable mixed expressions of opinion and fact "occur[ ] when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the article or assumed to exist by the parties to the communication." *Id.* (citing Restatement (Second) of Torts, § 566).

*Donnelly v. McConnell*, 2012 WL 2402803 (M.D. Fla. 2012). In determining whether a statement is actionable as defamation a court must "examine the statement in its totality and the context in which it was uttered or published." *From*, 400 So. 2d at 57 (quoting *Information Control v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980)).

Reading the entire November 26, 2010 press release containing the first statement, that Daddy Yankee "had been swindled by Diego Iraola," does not lead to the conclusion that the statement is an opinion, as a matter of law. *See* DE-35-2 at 156. The additional facts in the press release that explain why Balriri felt that Daddy Yankee had been swindled are also disputed. There are only two facts in the press release that support Baldiri's opinion – that Baldiri's signature had been forged and that Iraola had pocketed $516,955. However, both of these supporting facts are disputed, as set out elsewhere in this order. Therefore, Baldiri's alleged "opinion" may be based on facts which he may have known were untrue when he relied upon them in stating his opinion. Consequently, a genuine issue of material fact exists as to whether Baldiri's opinion was actually based on facts. The other two statements, however, are not pure opinion. They are actionable mixed expressions of fact and opinion. Reading the statement from which they both come, in its entirety, demonstrates that there are no facts set forth in the

16

statement that would support the statement that the businessmen were deceived or that Iraola had defamed Daddy Yankee. *See* DE-35-2 at 171. Consequently, all three of the statements are actionable.

iii.     *Defendants Have Not Established that All of the Statements Are True*

Defendants also argue that they are entitled to summary judgment on Plaintiffs' defamation claim and injurious falsehood claim because all of the statements are true. While Defendants have established the truth of Statement 7, they have failed to establish the truth of Statements 1, 2, 3, 4, 5, and 6. However, even if Statement 7 is true, as set out below, it may still be actionable. The Court, however, agrees with Defendants that Statement 9 does not contain defamatory statements and that the portion of the record cited in support of Statement 8 does not support a claim for defamation. Consequently, as explained below, summary judgment is denied as to Statements 1, 2, 3, 4, 5, 6, and 7 and granted as to Statements 8 and 9. The Court will address each of the nine statements listed above in order.

> **Statement 1**: "De Iraola, the producer who is responsible for the concerts in Argentina, still owes more than 40 percent of the total payment for the shows" [DE 35, Ex.3]; "... Five Live [] under the direction of Mr. Diego De Iraola, failed to satisfactorily comply with the provisions of the contracts entered between him and Icaro Booking Services." [DE-35, Ex. 3.]

Defendants argue that this statement is true because, at the time the tour was canceled, Plaintiffs owed $516,000, which is approximately 40% of the total $1,300,000 was owed on the Engagement and Second Contracts. First, the Court notes that the statement claims that Plaintiffs owed *more* than 40% of the contract price, while the outstanding balance was actually slightly *less* than 40% of the outstanding balance on both contracts.[9] However, as set out in the Court's

---

[9]Forty percent of $1,300,000 is $520,000.

previous Order addressing the contract claims, there is a genuine issue of material fact as to the

payment terms of the Second Contract. Thus, because Statement 1 addresses a failure to comply

with the payment provisions of both contracts, there is a material issue of fact as to the truth of

this statement. Consequently, summary judgment is denied.

> **Statement 2:** "The concerts have been planned for more than six months, which is why
> we gave the entrepreneur various payment options to help him honor his commitments to
> us. However these efforts were in vain because as of today, the day before our trip, he has
> failed to do so." [DE-35, Ex. 3.]

Defendants argue that this statement is true because Defendants gave Plaintiffs flexibility

in making their payments and meeting their contractual obligations. While that may be true, the

statement also states that Plaintiffs failed to meet their payment obligations. As set out above,

because a genuine issue of material fact exists as to whether Plaintiffs failed to meet their

payment obligations under the Second Contract, there is a genuine issue of material fact

regarding the truth of this statement. Consequently, summary judgment is denied.

> **Statement 3:** "A delegation of producers from several Argentine provinces came to
> Miami to meet with me and I demonstrated to them that my signature on what they signed
> with Iraola was forged." [DE-35, Ex. 66.]

Defendants argue that there is nothing false in this statement because it simply states that

Baldiri showed the Argentine producers that it was not his signature on the contracts. Plaintiffs,

respond that this statement is false and constitutes defamation per se because it alleges criminal

behavior by Iraola. However, contrary to Plaintiffs' assertions, the statement does not directly

accuse Iraola of forgery. While that may be one implication of the statement, the statement

simply states that the signature was forged, not who forged it. Furthermore, the evidence in this

case presents a threshold issue – whether there was a contract with Baldiri's forged signature on

it. If there is no such contract, then Baldiri's statement about being shown such a contract cannot be true.

Baldiri testified that the producers showed him a contract between Icaro Services and a local producer in Argentina with Baldiri's alleged signature on it. DE-135-37 at 221:11-17. Plaintiffs assert that they have submitted all of the contracts between Iraola and local producers and none of them purport to be between Icaro and the local producer and none have Baldiri's signature on it. *See* DE-156-2. In their surreply to Plaintiffs' Motion for Summary Judgment, Defendants state that they are filing the document with the allegedly forged signature in the record. *See* DE-164 at n.1. However, a review of the record indicates that no such document was filed. Thus, a genuine issue of material fact exists as to whether a contract exists with Baldiri's allegedly forged signature on it. If no such contract exists, Baldiri's statement is not true. Consequently, summary judgment is denied.

> **Statement 4:** "Baldiri reported that Iraola had pocketed $516,955 from the sale of shows and advertising promotions, which amounted to 40% of the contract price." [DE-35, Ex. 66.]

As the moving parties, the burden is on Defendants to establish that this statement is true. While it is true that $516,955 is approximately 40% of the amount owed under the contracts, Defendants have not presented any evidence that Iraola "pocketed" that money. Iraola testified that at one point he held $480,000 in cash in his house for payment of the contract balances. DE-135-29 at 197:4-25. However, Defendants have not presented any evidence establishing that Iraola actually kept that money. In their reply, Defendants assert that this statement is opinion. However, Defendants did not raise this argument in their initial motion and replies are limited to rebuttal of matters raised in the opposition. *See* Local Rule 7.1(c). Consequently, Defendants

are not entitled to summary judgment because they have not established the truth of this

statement.

> **Statement 5:** Plaintiffs allege: Five Live had "failed to confirm flight arrangements and work visas for Daddy Yankee's entourage." [DE-35, Exs. 67-69.]

Defendants have again failed to meet their burden on summary judgment. The evidence

cited by Defendants does not clearly establish that Plaintiffs failed to confirm flight arrangements

and work visas. The evidence indicates that by November 13, 2010 the visas had been requested

and that they were issued on November 17, 2010. Further, there is no clear evidence establishing

that Plaintiffs did or did not make flight arrangements. DE-138-10 at 8-33. Thus, it is simply

not clear from the evidence whether Plaintiffs made the necessary arrangements or not.

Accordingly, summary judgment is denied as to this statement.

> **Statement 6:** "t[]he businessmen affected by the lack of responsibility of this FIVE LIVE ENTERTAINMENT representative have contacted us not only by phone and e-mail but they have also travelled [sic] to our offices in Miami and learned what was happening with the agreements signed with IRAOLA. We have all done our best to benefit the public in general that is not responsible for these cancellations and to benefit the businessmen who were deceived by DIEGO DE IRAOLA shows arrangements." [DE-35, Ex. 70.]

Defendants assert that this statement is true because the evidence establishes that Iraola

did not have enough funds to complete his obligations to Defendants or to pay back the

producers. While Defendants have presented some evidence that Plaintiffs did not have enough

funds to complete their obligations under the contracts with Defendants, Defendants have not

presented any evidence establishing how the local businessmen had been deceived. There is no

evidence of any false statements made by Plaintiffs to the local businessmen or of any other

deceptive conduct directed at the businessmen. Thus, Defendants have failed to establish that

Statement 6 is true and summary judgment is denied.

> **Statement 7:** "This man signed [the documents] as being a part of Five Live
> Entertainment, but Five told me later that he was no longer in the group." [DE-35, Ex.
> 72-80]

Defendants argue that this statement is true because Iraola did sign documents on behalf

of Five Live and Baldiri was later told that Iraola was not authorized to sign on behalf of Five

Live. Both the Engagement Contract and the Second Contract state that they are entered into by

Five Live Entertainment represented by Iraola. Thus, the first clause of Statement 7 is true. In

support of the second clause, Defendants have presented two emails from people associated with

Five Live. The first, dated November 18, 2010, from Martin Nuñez Errea, an owner of Five

Live, states Iraola signed the contracts on an individual basis and Five Live had nothing to do

with the contracts. DE-135-30. The second, also dated November 18, 2010, is from Gabriel

Palermo at Gabriel@five-live.net and states that Iraola "has no power-of-attorney, nor position,

nor duty in our company, and that's why he cannot sign anything under our name." DE-135-31.

Plaintiffs have not challenged the authenticity of the emails. Instead, Plaintiffs assert that they

have presented evidence that Iraola had authority to act on behalf of Five Live. However,

Plaintiffs' evidence does not demonstrate that Defendants did not receive emails making the

representations about Iraola's authority to act on behalf of Five Live. Thus, the evidence, taken

in the light most favorable to Plaintiffs, establishes that Statement 7 is true. Under Florida law,

however, truth is not necessarily a defense to defamation. Repetition of a libel per se may be

actionable even though the person making the statement refuses to personally vouch for its

veracity. *Lewis v. Evans*, 406 So. 2d 489, 494 (Fla. 2d DCA 1981). Thus, if Plaintiffs can

establish that this statement constitutes libel per se, Defendants may be liable regardless of the

truth of the statement.  Consequently, summary judgment is denied.

> **Statement 8:**  Plaintiffs allege in the Amended Complaint: "Baldiri also told local producers, who had acquired rights to, or were otherwise involved in producing Daddy Yankee's performances that Plaintiff De Iraola had perpetrated a fraud on them... Baldiri encouraged and, in fact, caused the local producers to join him in disparaging Plaintiff De Iraola and Five Live under pretenses of future contracts with Daddy Yankee. Baldiri, other Icaro employees, and Ms. Gonzalez even worked with the local producers to draft press releases that the local producers could release to the media. [DE-35, Ex. 81.]

Statement 8 is an allegation in Plaintiffs' Amended Complaint.  *See* DE-35 at ¶82.

Plaintiffs cite to an email exchange between one of the local Argentine producers, Leandro

Geneyro, and an Icaro employee, Andrea Matinez, in support of this allegation. DE-35, Ex. 81.

However, the content of the email does not say anything about fraud, much less use the word

"fraud." *See id.*  Furthermore, the rest of the allegations do not amount to defamation of

Plaintiffs by Defendants.  Plaintiff responds that there is no evidence that Iraola perpetrated a

fraud on the local producers.  While this may be true, the statements in the email exchange cited

by Plaintiffs say nothing of a fraud and thus the email cannot be the basis of a defamation claim.

Consequently, summary judgment is granted to the extent the defamation and injurious falsehood

claims are based on the email attached as Exhibit 81 to Plaintiffs' Amended Complaint.

> **Statement 9:**  Plaintiffs allege: "Baldiri complained to some of those local businessmen that they had not been aggressive enough with Plaintiff De Iraola in the media and exhorted them to "hit [De Iraola] hard." [DE-35, Ex. 82.]

Defendants argue that this statement is not defamation.  The Court agrees that this

statement does not constitute defamation because there are no statements about either one of the

Plaintiffs.  It is noteworthy that Plaintiffs did not contest the Defendants' position.

Consequently, summary judgment is granted as to this statement.

> **C.    Conspiracy to Defame**

Both sides move for summary judgment on Plaintiffs' conspiracy to defame claim. Defendants move for summary judgment on Plaintiffs' conspiracy to defame claim because the defamation claim fails. However, as set out above, Plaintiffs' defamation claim does not fail in its entirety. Consequently, Defendants are not entitled to summary judgment on this claim.

Plaintiffs also move for summary judgment on their conspiracy claim. The elements of a civil conspiracy are: (a) an agreement between two or more parties,[10] (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy. *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006). In order to establish the overt act element, Plaintiffs rely on the same arguments made in support of their motion for summary judgment on their defamation claim. However, as set out above, because Plaintiffs have failed to establish publication by Defendants of the particular statements set out in their motion, Plaintiffs have failed to establish one of the elements necessary for defamation. Thus, Plaintiffs have not established one of the elements necessary for their civil conspiracy claim – an overt act. Consequently, summary judgment is denied as to this claim.

### D.    Plaintiffs' FDUTPA Claim, as Pled in the Amended Complaint, Has Been Abandoned

Both sides have moved for summary judgment on Plaintiffs' FDUTPA claim. Defendants' motion argues that Plaintiffs have not established that Defendants' actions were

---

[10]If Plaintiffs intend to proceed with this claim, they will need to more clearly establish the existence of a conspiracy. In their motion, Plaintiffs gloss over this element of their claim by simply stating that "Defendants worked jointly." *See* DE-137 at 10. However, "an actionable conspiracy generally cannot exist between an entity and its officers, agents, or employees." *Kurnow v. Abbott*, 114 So. 3d 1099, 1102 (Fla 1st DCA 2013). Thus, Plaintiffs will have to establish that Defendants were acting on behalf of separate entities.

immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

Specifically, Defendants argue that the following alleged actions were not deceptive or unfair: (1)

using leverage to extort extra-contractual concessions; (2) forcing Plaintiffs to produce the four

additional concerts; (3) causing Plaintiffs to incur unnecessary expenses; and (4) defaming

Plaintiffs.  Plaintiffs respond by arguing that Defendants have misconstrued the FDUTPA claim.

Plaintiffs assert in their response to Defendants' motion that the FDUTPA claim is based

on Defendants' pattern and practice of canceling shows and pocketing money paid to them by

producers, regardless of the reasons for cancellation.  Defendants respond that this is the first

time in the proceedings that Plaintiffs have raised this alleged pattern and practice of canceling

tours.  A review of the pleadings demonstrates that Defendants are correct; Plaintiffs have not

pled a claim based on Defendants' alleged practice of canceling concerts and pocketing the

money.  In fact, nothing in the Amended Complaint refers to this alleged practice.  Plaintiffs

cannot raise a new claim through summary judgment.  *See Gilmour v. Gates, McDonald & Co.*,

382 F.3d 1312, 1314-15 (11th Cir. 2004).  The proper procedure would have been to seek to

amend their pleadings.  *Id.*  Moreover, the parties agreed to a July 30, 2012 deadline for

amending the pleadings and the Court adopted that deadline in its Order Setting Trial Date.  *See*

DE-30 at 12 and DE-37 at 1.  Thus, the Plaintiffs cannot now amend their FDUTPA claim.

Defendants further assert that they are entitled to summary judgment because Plaintiffs

have failed to directly respond to Defendants' arguments regarding the FDUTPA claim, as

alleged in the Amended Complaint.  Thus, Defendants maintain that Plaintiffs have abandoned

their FDUTPA claim, entitling Defendants to summary judgment.  A failure to address issues in

response to a motion is grounds for finding that the claims have been abandoned.  *See Coalition*

*for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir.

2000) and cases cited therein.  A review of Plaintiffs' response clearly indicates that Plaintiffs

have not responded to Defendants' arguments regarding the FDUTPA claim.  Further, a review

of the Amended Complaint demonstrates that the FDUTPA claim alleged in the Amended

Complaint is based on Defendants' alleged (1) use of leverage to extort extra-contractual

concessions; (2) use of force to have Plaintiffs produce the four additional concerts; (3) causation

of unnecessary expenses for Plaintiffs; and (4) defamation of Plaintiffs.  Given Plaintiffs' failure

to respond and their statement of the nature of the FDUTPA claim in their response to

Defendants' motion for summary judgment, Plaintiffs have abandoned their FDUTPA claim as

pled and Defendants are entitled to summary judgment.

**E.     Defendants' Defamation Counterclaims**

Plaintiffs move for summary judgment on Defendants' defamation counterclaims both of

which are based on Plaintiffs' December 27, 2010 press release.  The press release stated in part:

> With an international arrest warrant, Daddy Yankee will have to appear before the
> Argentine Courts . . .  In view of the false information reported so far by the artist
> DADDY YANKEE through the agency that represents him in different press releases and
> interviews, it is my duty to publish this brief press release.
> DADDY YANKEE and Icaro Services Inc. wanted from the beginning to wage a media
> war without any legal foundation, slandering me in order to justify their unjustifiable
> decision . . .
> . . . both [the local producers'] payments and mine are fully in the possession of MR.
> DADDY YANKEE; providing . . receipts for the payments sent to the account indicated
> by the artist belonging to the company ICARO SERVICES INC. (his official booking
> worldwide).
> I have to say that to date I have not received any effective communication from Mr.
> DADDY YANKEE or from the company Icaro Services Inc. explaining the reasons for
> the cancellation formally and as due considering such a significant CONTRACT between
> the parties.
> Both the fans and I only know what Icaro Services Inc. and DADDY YANKEE, for the
> sole purpose of continuing to damage me  published in Internet sites, based on unfounded

allegations, something which, from the legal standpoint, is inconceivable. . . . DE-135-35. Plaintiffs argue that the statements are either true or un-actionable opinion. Because some of these statements are true, the motion is granted in part. The Court will address each of the statements in order.

In support of the truth of the first statement, that Daddy Yankee has an international arrest warrant and must appear before the Argentine courts, Plaintiffs present the Affidavit of Iraola in which he states that he commenced a criminal action in Argentina against Daddy Yankee, Mireddys Gonzalez, and Baldiri. DE-138-9 at ¶35. However, that is not evidence that an international arrest warrant had been issued for Daddy Yankee or that he had to appear before an Argentine court. Consequently, Plaintiffs have failed to establish the truth of this statement and summary judgment is denied.

Plaintiffs also argue that it is true that Defendants reported false information about Plaintiffs. Given the Court's findings, set out above, that issues of fact exist as to the truth of many of the Defendants' statements, issues of fact also exist as to the truth of Plaintiffs' statement that Defendants released false information about Plaintiffs. Consequently, summary judgment as to this statement is denied.

Plaintiffs maintain that the statement that Defendants want to wage a media war is pure opinion and it is true. Plaintiffs point to the fact that, by the time of this press release, Defendants had already issued several press releases and had approached some of the local producers to also issue press releases. In fact, as discussed above, Baldiri sent an email, to some of the local producers stating that "we have not been strong enough with the press . . . we have to hit hard." DE-35-2 at 229. In response, Defendants assert that Plaintiffs have not established

26

that the statement is true and that no facts were provided to the reader to establish it was opinion.

While Plaintiffs did not cite to the email, it is part of the record and, when combined with the

numerous press releases issued by Defendants prior to this statement, it leads to a conclusion that

the statement is true. Consequently, Plaintiffs' summary judgment is granted as to this statement.

Plaintiffs argue that the statement that Daddy Yankee and Icaro are in receipt of the

payments is true. Defendants respond that there is no evidence that they are in receipt of the

money from the local producers. Plaintiffs have not presented any evidence that any of the local

producers made payments to Defendants. Thus, summary judgment is granted as to the portion

of the statement regarding Defendants' receipt of Plaintiffs' payments but denied as to the

portion regarding the local producers.

Finally, Plaintiffs argue that it is true that Defendants never sent Plaintiffs a formal

document explaining the cancellation of the tour. Defendants respond that Mireddys Gonzalez,

on November 16, 2010, sent Iraola an email explaining the cancellation of the tour. DE-138-29.

Plaintiffs respond that the email is not a *formal* document; therefore, the statement is true.

Neither side has offered any authority to explain what constitutes a "formal" communication.

Given that email communication is common in business today and was clearly regularly used by

the parties in this case, a genuine issue of material fact exists as to whether the email from

Gonzalez would constitute a *formal* communication. Therefore, summary judgment is denied.[11]

### F.    Defendants' Promissory Estoppel Counterclaim is Dismissed

Plaintiffs move for summary judgment on Defendants' promissory estoppel claim

---

[11]If Defendants intend to proceed with this claim based on the statement about a formal communication, they will need to establish why such a statement is defamatory and both sides will need to draft a jury instruction addressing the definition of formal.

because the claim is barred by the existence of the Engagement and Second Contracts. Defendants do not dispute the law; instead, they dispute the authority of Iraola to enter into the contracts on behalf of Five Live.  However, Defendants have not presented any evidence establishing that Iraola did not have the authority to enter into the contracts.  Furthermore, the Court has previously held, based on Defendants' admissions, that the Engagement Contract is valid and binding. *See* DE-167 at 6.  Thus, Defendants, by recognizing the validity of the Engagement Contract, have implicitly recognized Iraola's authority to enter into the contracts on behalf of Five Live.  Consequently, summary judgment is granted and Defendants' promissory estoppel claim is dismissed.

### G.    Defendants' Affirmative Defenses

Defendants have pled thirty-six affirmative defenses and have voluntarily dismissed two, Affirmative Defenses 15 and 36, which raised the economic loss rule.  Plaintiffs have moved for summary judgment on Defendants' Affirmative Defenses 1-3, 6-8, 11-14, and 20-25.

> i.    *The Contract Defenses: The Motion is Denied as to the First, Second, Third, Fifth, and Twenty-Second through Twenty-Fifth Affirmative Defenses and Granted as to the Sixth, Seventh, and Eighth Affirmative Defenses*

Defendants' First, Second, and Third  Affirmative Defenses pertain to Plaintiffs' claim for breach of the Engagement Contract.  They assert excused performance of the Engagement Contract based on Plaintiffs' prior breach and that Iraola lacked authority to enter into the Engagement Contract.  The Court, by prior order, granted Defendants' summary judgment on this claim.  Therefore, the motion as to these three Affirmative Defenses is denied as moot.

The Fifth and Sixth Affirmative Defenses pertain to the breach of the Second Contract

claim.  In a prior order, the Court found that genuine issues of material fact exist as to the payment terms of the Second Contract.  Therefore, the motion is denied as to the Fifth Affirmative Defense, which alleges that Plaintiffs breached the Second Contract by failing to make timely payment.  The Sixth Affirmative Defense alleges that Plaintiffs breached the Second Contract by failing to timely obtain work visas.  Plaintiffs have presented evidence that the work visas were issued on November 17, 2010, two days before the first scheduled concert.  DE-138-10 at 8-33.  While Defendants argue that the electronic signatures on the visas show a November 23, 2010 date, a review of the documentation indicates that the November 23, 2010 date is the date that certified copies of certain records were issued separately.  *See* DE-138-10 at 34.  Thus, the record evidence does not affirmatively establish that Plaintiffs did not timely obtain the visas and summary judgment on the Sixth Affirmative Defense is granted.

Defendants' Seventh Affirmative Defense challenges Iraola's authority to enter into the Second Contract.  Defendants have not presented any evidence that establishes that Iraola lacked authority to enter into the Second Contract.  Therefore, summary judgment is granted as to the Seventh Affirmative Defense.  The Eighth Affirmative Defense alleges that the claim for breach of the Second Contract fails based on the parol evidence rule.  The Court has already addressed this issue in its prior order on the motion for summary judgment and found that the parol evidence rule is inapplicable here.  Accordingly, the motion is granted as to the Eighth Affirmative Defense.

Affirmative Defenses Twenty-Two through Twenty-Five address the damages under Plaintiffs' contract claims. Twenty-Two and Twenty-Three allege that Plaintiffs failed to mitigate and Twenty-Four and Twenty-Five allege that Plaintiffs' damages are the result of Plaintiffs'

actions or inactions.  While Plaintiffs argue that these claims lack any factual support, Plaintiffs

have failed to meet their burden of showing that no genuine issue of fact remains as to these

claims.  There is evidence suggesting that Plaintiffs may not have had sufficient funds to pay and

Plaintiffs have failed to point to any evidence establishing that they mitigated their damages.

Thus, summary judgment is denied as to these Affirmative Defenses.

> ii.     *The Equitable Defenses:  The Motion is Denied as Moot as to Affirmative*
> *Defenses Twenty and Twenty-One*

Plaintiffs seek summary judgment on Defendants' Affirmative Defenses Twenty and

Twenty-One.  Both of these defenses raise unclean hands in response to Plaintiffs' equitable

claims.  However, the Court has dismissed Plaintiffs' claims for unjust enrichment and quantum

meruit.  Therefore, the motion is denied as moot as to these defenses.

> iii.    *The Defamation Defenses: The Motion is Denied as to Affirmative*
> *Defenses Eleven through Fourteen*

Plaintiffs seek summary judgment on Defendants' defamation defenses, Eleven through

Fourteen.  These defenses raise the same issues raised by Defendants in their motion for

summary judgment on Plaintiffs' defamation claims – truth, opinion, and qualified privilege.  As

set out above, genuine issues of material fact exist as to these issues.  Consequently, the motion

is denied as to these defenses.  Accordingly, it is

ORDERED that:

1. Defendants' Motion for Summary Judgment [DE-136] is granted in part and denied in

part.

2. Plaintiffs' Motion for Summary Judgment [DE-137] is granted in part and denied in

part.

3. The following claims remain to be tried:

    a. In the Amended Complaint:

        Count II for breach of the Second Contract

        Count V for defamation, as set out herein

        Count VI for injurious falsehood, as set out herein

        Count VIII for civil conspiracy to defame

    b. In the Counterclaim:

        Count II for breach of the Second Contract

        Count IV for defamation, as set out herein

        Count V for defamation per se, as set out herein

4. The parties' Joint Pretrial Statement is due on **August 26, 2013**. Prior to submitting the Pretrial Stipulation, the Court expects counsel to meet in person to simplify the issues in the case, determine which claims they plan to proceed to trial on, and which defenses they intend to raise at trial. In addition to the items required by Local Rule 16.1, the parties Joint Pretrial Stipulation shall include:

    a. A list of the specific statements that each side intends to rely upon as support for their remaining defamation claims, including who made the statement, when it was made, who published the statement, and to whom it was published.[12]

    b. A list of the remaining specific affirmative defenses that Defendants intend to

---

[12]While the motions for summary judgment seem to address everything but the kitchen sink, for trial the parties are strongly encouraged to simplify their cases and proceed only on their strongest claims and defenses. Prior to submitting the Pretrial Stipulations, each side needs to consider how they will present their claims to the jury and will need to draft clear, concise jury instructions for each claim and defense.

pursue at trial and a succinct statement of the facts to support each defense.

   c.  In addition to the requirements of Local Rule 16.1(e)(9), the parties shall

prepare their exhibit lists using Form AO 187, which is available through the Court's website,

and identify the witness introducing each exhibit.  In addition to the requirements of Local Rule

16.1(e)(10), the witness lists shall contain a one sentence synopsis of the testimony, and in

consultation with opposing counsel, indicate the amount of time needed for direct and cross

examination of the witness.

   d.  Proposed Jury Instructions and Verdict Forms.  The parties shall file (and

email a copy to Chambers in Wordperfect format to *Seitz@flsd.uscourts.gov*) Proposed Jury

Instructions in the following form:

     1. Stipulated Instructions:  To the maximum extent possible, the parties shall agree on one stipulated set of proposed jury instructions; only true conflict or uncertainty in binding substantive law (*i.e.*, 11th Circuit, etc.) should prevent such agreement.  The Court generally follows the form of preliminary instructions and instructions on substantive legal claims contained in the most current editions of the ELEVENTH CIRCUIT PATTERN JURY INSTRUCTIONS (federal claims and introductory instructions) and the FLORIDA STANDARD JURY INSTRUCTIONS (state claims).

     2. Disputed Instructions: To the extent that counsel are unable to agree on instructions, each side may tender a set of disputed instructions.  Plaintiffs' disputed instructions should be clearly labeled as "Plaintiffs'" (numbered 1, 2, 3, etc.) and Defendants' disputed instructions should be clearly labeled as "Defendants'" (numbered 1, 2, 3, etc.).

     3. Authority for Stipulated and Disputed Instructions:  For each stipulated and disputed instruction, the party submitting the instruction shall indicate the source and authority for the instruction.  If the source is a pattern instruction from a source not listed above, the party submitting the disputed instruction shall submit a copy of the pattern instruction and identify the authority

underlying the pattern instruction.

4.    Special Procedure for the Party Opposing a Disputed Instruction: The party opposing a disputed instruction shall file an Objection that contains: (1) an explanation for their objection to the disputed instruction; (2) the authority relied on in support of their objection; (3) whether they have submitted an alternate instruction to the disputed instruction; (4) an explanation for why the alternate instruction should be given; and (5) the authority relied on in support of the alternative instruction.

5.    Verdict Form: The parties shall submit a joint verdict form, to the extent possible.  The Verdict Form should require the jury to make findings as to each allegedly defamatory statement and to any defense raised to each defamatory statement.

e.  Joint Summary of Respective Motions in Limine.  The Summary, which shall be filed with the Pretrial Stipulation, shall contain a cover page providing the style of the case and an index of the motions in limine. The parties shall attach their motions to the Summary as follows: for each evidentiary issue a party may submit a one (1) page motion identifying the evidence sought to be precluded at trial and citing legal authority supporting exclusion; and the opponent may submit a one (1) page response providing a statement of the purpose for which the challenged evidence would be offered and citing legal authority in support of admission of the challenged evidence.  **No motion in limine or response shall exceed one typed single-spaced page.** The parties shall work together to prepare the Summary, and prior to submitting it to the Court, the parties are encouraged to resolve evidentiary issues through stipulation.

DONE and ORDERED in Miami, Florida, this _15_ day of August, 2013.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:    All Counsel of Record

33